

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OREGON

Elizabeth Diane Downs,
  Plaintiff

Case Number: 6:23-cv-119-MK

Lane County Oregon,
  Defendant

42USCS1983
Civil Rights Complaint

---

# OPENING PETITION

PLAINTIFF PRO SE
Elizabeth Diane Downs W49707
CCWF 512-02-02L
Chowchilla, Ca 93610-1508

DEFENDANT
Lane County Oregon
Lane County Courthouse
125 E. 8th Avenue
Eugene, OR 97401

1-14-2023

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OREGON

Elizabeth Diane Downs,
          Plaintiff                Case Number:

          v

Lane County Oregon,                42 USCS 1983
          Defendant                Civil Rights Complaint

---

### I. AUTHORITY

Since 2015, Defendant has illegally imprisoned Plaintiff by violating Oregon DNA Statutes.

> DOE v BARGER, 193 F. Supp. 2d 1112 (2002)
> 42 USCS 1983 may be used to enforce
> Statutory Rights as well as Constitutional
> Rights.

> 5 USC 706: " ... the reviewing court shall
> decide all ... STATUTORY provisions ... The
> reviewing court shall ...
>     (1) compel agency action unlawfully withheld ...;
>     (2) hold unlawful and set aside actions, findings,
>         and conclusions found to be ---
>         (A) arbitrary, capricious, an abuse of
>             discretion or otherwise not in accordance
>             with  the law;
>         (B) contrary to constitutional right ...

> SKINNER v SWITZER, 562 U.S. 521, 524-525 (2011)
> Plaintiff may file a lawsuit pursuant to 42 USCS 1983,
> alleging a procedural due process violation and seek
> an injunction to perform DNA testing.

Plaintiff is not seeking release from prison by this action.

Page 1 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

She's seeking financial compensation for years of cruel and
unusual punishment inflicted on her by Lane County Oregon Judges
who've used their badges of authority to deprive her of the right
to due process guaranteed by the 6th and 14th Amendments of the
United States Constitution.

> DUCHESNE v SUGARMAN, 566 F2d 817 (2nd Cir. 1977)
> 42 USCS 1983 was designed to protect individuals
> against misuse of power made possible only because
> the wrongdoer is clothed with authority of State Law.

42 USCS 1983 has the authority to try the case brought
against Defendant by Plaintiff in this DNA case.

## II. EXHAUSTION OF APPELLATE REMEDIES

Plaintiff filed for Post Conviction Relief under ORS 138.690
to have DNA tested in the case of Downs v Oregon, Lane County Case
Number:  22-CV-16308, on 5-18-2022.

On 10-30-2022, Plaintiff's brother searched online for a
status of said case because Plaintiff had heard nothing from the
Court.  That was when Plaintiff discovered Judge Jay A. McAlpin
had dismissed her DNA case on 10-4-2022.

Plaintiff's Notice Of Appeal had to be filed by 11-3-2022.
She immediately wrote to the Court to request a copy of the "Order
To Dismiss" (App. 1).

On 11-21-2022, Plaintiff received a letter from the Court,
allegedly mailed to Plaintiff on 11-9-2022 (six days past the date

Page 2 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

Plaintiff's Notice Of Appeal had to be filed).  It's clear the Court never intended to send Plaintiff a copy of the Court Order at all (App. 2).

The 10-4-2022 date on the Judgement Order prevented Plaintiff from filing a timely Notice Of Appeal after 11-3-2022 (App. 3). Because of Lane County Oregon's trickery and deceit, Plaintiff has no option but to seek relief by virtue of 42 USCS 1983.

III. PARTIES AND JURISDICTION

Plaintiff is an Oregon prisoner, tried for murder and attempted murder in Lane County, Oregon in 1984.

Defendant amounts to all Officers of the Lane County Court, Lane County Sheriff's Officers and Detectives involved in the investigation, arrest, and trial of Elizabeth Diane Downs, and all Officers of the Court (including all subsequent District Attorneys) who've had a hand in denying Plaintiff the Statutory Right to have evidence in her case tested for DNA.

> DISTRICT OF COLUMBIA v CARTER, 409 U.S. 418
> 93 S.Ct. 602 (1973)
> The purpose of 42 USCS 1983 is to afford a Federal
> Right in a Federal Court to have DNA tested because,
> by reason of prejudice, passion, neglect, intolerance,
> or otherwise, State Laws have not been enforced and
> claims of citizens to enjoyment of rights, priviledges,
> and immunities guaranteed by the Fourteenth Amendment
> were denied by State Agencies.

Plaintiff petitioned Lane County to test DNA evidence in her case.  Defendant refused to try the case.

Page 3 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

DAVIS v SCHERER, 468 U.S. 183; 104 S.Ct. 3012 (1984)
Through Civil Rights Statutes, Congress intended to
enforce provisions of the Fourteenth Amendment against
those who carry a badge of authority of State and in
some capacity misuse it.

COSTANICH v DEPARTMENT OF SOCIAL AND HEALTH SERVICES,
                    627 F3d 1101, 1110 (9th Cir. 2010)
"Substantive due process protects individuals from
arbitrary deprivation of their liberty by government"
[DNA Jury Instructions]

## IV. LANE COUNTY'S HISTORY

It is necessary for Plaintiff to establish Lane County's
history of evidentiary abuse lest this Court be deceived into
believing Lane County Judge Jay A. McAlpin's decision to dismiss
Plaintiff's DNA Petition was a one-off oopsie.

While it is Plaintiff's position the DNA evidence in her
case should be tested to prove her actual innocence, Plaintiff
has no faith in Lane County's handling of and interpretation of
the evidence.

Lane County's history of mishandling of evidence will prove
this Court should DNA-test the evidence in Lane County's custody
and award Plaintiff damages because Lane County wittingly withheld
the truth about the DNA evidence since 2015 for the purpose of
illegally imprisoning Plaintiff these past eight years.

On 5-19-1983, Plaintiff and her three children were shot by
a male stranger.  That same night, Lane County Criminalist Jim Pex
found chewed gum and beer cans near the murder casings (App. 4).

Page 4 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

One year later, Lane County entered the chewed gum into evidence as EXHIBIT 15, at trial (App. 5).  In 1998, the Lane County Evidence Manager told Federal Investigator William Teesdale that evidence in a murder trial is kept forever (App. 6).

———————

The shooter fired his gun at the Downs Family six times. Lane County swabbed Plaintiff's hands for gunshot residue (GSR) at the hospital.  The Lab results came back three months later (App. 7).  Plaintiff didn't fire a gun the night of the shooting. She certainly didn't discharge a weapon SIX TIMES.

Shortly after Plaintiff's hands were swabbed for GSR, Lane County performed a trace metal test on her hands (App. 8).  Within two hours of the shooting Lane County knew Plaintiff neither held nor fired a gun the night Plaintiff and her children were shot by a male stranger wearing a short, shag haircut and denim jacket.

Rather than follow the evidence, Lane County employed a witness to perjure herself for the State (App. 9).  At the 1984 trial Judy Patterson convinced the jury Plaintiff went into the Emergency Room bathroom, didn't close the door, and ran water in the sink.  What was the jury expected to think except the State wanted them to believe Plaintiff washed her hands of incriminating evidence.

Lane County knew their witness was lying.  One year earlier Patterson reported to police that Plaintiff went nowhere near the bathroom the night of the shooting (App. 10).

Page 5 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

UNITED SATATES v AGURS, 427 U.S. 97, 102 (1976)
"The [Supreme Court] has consistently held that
a conviction obtained by the known use of perjured
testimony is fundamentally unfair, and must be set
aside if there is any reasonable likelihood that the
false testimony could have affected the judgment of
the jury".

Lucky for Lane County, Defense Counsel didn't call in an
expert to show GSR cannot be "rinsed off" with running water,
AND he didn't use Patterson's year-old police report to prove
the State's witness was lying.  Lucky for Lane County?  Or was
it something more devious?

---

The murder scene was processed for fingerprints (App.11).
Lane County didn't enter the prints into the National Fingerprint
Database to discover the identity of the perpetrator who murdered
Plaintiff's seven-year-old daughter.  Lane County ONLY compared
the prints on Plaintiff's car to the Plaintiff.

There were 24 finger and palm prints at the murder scene that
didn't match Plaintiff.  When asked why Defense Counsel didn't use
the report to assist his client, it was learned Prosecutor Fred
Hugi convinced Plaintiff's attorney to NOT use the report to
effectively defend his client and prove that someone other than
Plaintiff and her children were at the scene of the shooting that
night (App. 12).

---

Plaintiff was not permitted to visit her three-year-old son in the hospital after 6-18-1983. In July 1983, Daniel began telling his hospital nurses about the "mean man" who shot him (App. 13). Prosecutor Hugi didn't want the jury to know about the child's spontaneous utterings so he convinced Judge Gregory Foote to rule those particular reports inadmissible while allowing all other hospital reports into evidence.

Plaintiff's eight-year-old daughter was asked to draw a picture of the person who shot her (App. 14). She drew a picture of a left-handed man holding a gun. In fact, only a left-handed person could've negotiated the attack on Plaintiff's son behind the driver's seat (App. 15). Plaintiff is and has always been right-handed.

Christie drew her attacker wearing a short, shag haircut and a solid colored jacket. Plaintiff's hair was much longer (App. 16) and she was wearing a plaid shirt that night.

Lane County didn't want the jury to think about those facts, so they had Dr. Carl Peterson write "Mom with gun" at the top of Christie's drawing of her attacker. That's called JURY TAMPERING.

The drawing of Christie's mom shows Plaintiff wearing the plaid shirt (App. 17). The Court can see Plaintiff's hands are raised in a defensive posture and they're empty. Christie was showing everyone there was no gun in her mom's hand. Again, Lane County didn't want the jury to "get it", so they wrote "Cheryl" at the top of that drawing.

Page 7 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

But, Cheryl never owned a plaid shirt.  Nor did Christie or
Daniel.  Only Plaintiff owned a plaid shirt in Christie's family,
and her mom was wearing it when she faced down the man who shot
her children the night of May 19, 1983.

> GEORGE v CAMACHO, 119 F3d 1393 (9th Cir. 1997)
> MARIANA ISLANDS v MENDIOLA, 976 F2d 475, 486 (9th Cir. 1992)
> quoting
> BERGER v UNITED STATES, 295 U.S. 78, 88;
>         55 S.Ct. 629, 633; 79 L.Ed. 1314 (1935)
> "It is as much [the prosecutor's] duty to refrain
> from improper methods calculated to produce a wrongful
> conviction as it is to use every legitimate means to
> bring about a just one".

Nineteen days after Cheryl Lynn Downs was murdered with a
.22 caliber semi-automatic Ruger (that disappeared with the shooter),
John Oliver was murdered with a .22 caliber semi-automatic Ruger
(that disappeared with the shooter) a mile away.

Lane County Deputy District Attorney Fred Hugi prosecuted two
men for the Oliver murder AFTER he prosecuted Plaintiff for her
daughter's murder.  He used ballistics evidence in both cases,
gaining convictions in all cases.

On 11-20-1994, Ricky Kuppens confessed to the murder of John
Oliver and committed suicide with the .22 caliber semi-automatic
Ruger he used to kill Oliver.  Lane County fought to support the
wrongful conviction of two innocent men.  Lane County also refuses
to let Plaintiff see the ballistics in the Oliver case, to see if

Page 8 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

the gun Kuppens used to kill Oliver was also used to kill her daughter.  Lane County fiercely defends their convictions.  Especially their wrongful convictions.

> SMITH v SECRETARY OF NEW MEXICO DEPARTMENT OF
> CORRECTIONS, 50 F3d 801, 823 (1995)
> "The prosecutor, acting as a representative of the
> sovereign, has an obligation to ensure 'not that
> it will win a case, but that justice shall be done'.
> United States v Bagley, 473 U.S. 667, 675 (1985)
> (quoting BERGER @ 88)".

By now it should come as no surprise to this Court that Lane County refuses Plaintiff's request to re-examine and compare the ballistics in the Oliver case and Downs case.

In the absence of a murder weapon in the Downs case, Lane County claimed ejector marks on the base of the murder casings matched extractor marks on the base of cartridges allegedly found in Plaintiff's apartment.

Lane County brought in California Criminalist John Murdock to support the claim of Jim Pex that these matching marks put the murder weapon in Plaintiff's possession.  But John Murdock wanted to perform tests of his own first.  Tests he documented in writing and in photograph.  Murdock noted the marks on the murder casings and the cartridges DO NOT MATCH (App. 18).

In fact, Murdock's last notation before Lane County sent him packing was:

> "a re-exam has caused me to reconsider the id --
> it seems to fall apart at 4x obj.  I told Jim Pex
> ... he made some tests wherein he caused marks to
> be made on base of test ctgs ''

Page 9 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

A year later Pex testified (App. 19):

> "I obtained several Rugers around town from
> both sporting goods stores and from our firearms,
> our weapons expert in Salem.  He maintains our
> weapons that are seized from courts and insures
> their destruction, but he had a number of Rugers
> that were ready to be destroyed, and he sent them
> to me".

One of those Rugers, used in another crime was used by
Lane County's Jim Pex to manufacture ballistics marks on the
base of cartridges (and to create matching marks on casings
after John Murdock was sent back to California?).

It's no wonder Lane County will not let Plaintiff or her
attorneys see the ballistic evidence in the Downs case and
compare it to the Oliver case.  That nasty business is best
kept under the rug.  Best for Lane County.  Not so good for
Justice.

_____

Defense Counsel did try to see the police reports before
and during trial (App. 20).  During the trial, Lane County
Investigator Roy Pond was questioned by the Court during an
"Offer of Proof" hearing outside the presence of the jury.

Pond's job was to follow up on leads.  He said the information
in those reports "substantiated the defendant's version of what
happened" (App. 21).  Pond testified Lane County Sergeant Hince
ordered him to stop investigating leads one month after the
shooting.  Pond was transferred to the County Jail and testified

Page 10 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

reports were subsequently destroyed.  Judge Foote examined the
reports provided to him by Lane County Officers of the Court and
said he found nothing of use to the defense.

> UNITED STATES v BUTLER, 567 F2d 885, 891 (9th Cir. 1978)
> "Since ... investigative officers are a part of the
> prosecution, the taint on the trial is no less if they
> rather than the prosecution were guilty of nondisclosure".

Ten years after the shooting, Plaintiff learned the name of
a "Free Soul" Affiliate who'd been confessing to the murder of
her daughter since the day after the shooting.  James Clair Haynes.
The Plaintiff brought this man's confession to Lane County and
asked them to investigate.  They refused.  They said the case
was closed.

Five years after that, Federal Attorney Wendy Willis and
Federal Investigator William Teesdale tried to get the withheld
reports referred to by Officer Pond during trial.  Lane County
said they couldn't see the reports because the case was ongoing.
Then Lane County said there were no reports at all and everything
had been destroyed (App. 22).

Federal Judge Ansel Haggerty finally issued a warrant, directing
Lane County to release all reports in their possession to the
Federal Attorneys.  Among the 4700 documents Lane County withheld
was a report dated two days after the shooting (App. 23 ).  A
caller reported a "Free Soul" Affiliate was confessing to the
shooting of the Downs Family.  This 15 year old report would've

Page 11 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

aided Plaintiff in her defense (App. 24).  Lane County lied to State Judges, a Federal Judge, to the jury, the media, and the world to secret the truth away for 40 years.  Plaintiff has no reason to trust Lane County will test the DNA and/or tell the truth about the DNA test results after all this time.

> CARRIGER v STEWART, 132 F3d 463, 479 (9th Cir. 1997)
> "Evidence is material, and must be disclosed, 'if there
> is a reasonable probability that, had the evidence been
> disclosed to the defense, the result of the proceeding
> would have been different'. (citing Kyle v Whitley,
> 514 U.S. 419, 433; 112 S.Ct. 1565 (1995) and United
> States v Bagley, 473 U.S. 667, 682; 105 S.Ct. 3383
> (1985).)".

It isn't Plaintiff's goal to retry her 40 year old case in this Court.  She simply felt the need to show this Court why she was denied her Statutory Right to have the DNA tested in the evidence in Lane County's possession.

Lane County has never released exculpatory evidence to Plaintiff without a District Court Order and they never will.

> UNITED AIRLINES v EVANS, 431 U.S. 553 (1997)
> When wrongful conduct has accrued over a period of
> time, the violation is considered a continuing wrong.

Lane County has known since 2015 that the DNA evidence in this case vindicates Plaintiff but they refuse to try the case. Plaintiff requests compensation for their continuing wrong.

V. CLAIM FOR RELIEF

Plaintiff has not been housed in Oregon since 1987. She didn't know about the Post Conviction Statute Oregon Legislators put on the books in 2000 regarding DNA. She only knew there was DNA evidence to be tested in her case.

In 2015, Plaintiff filed a WRIT OF HABEAS CORPUS in Lane County to have the DNA tested in the chewed gum. She submitted her Petition in March 2015. The Court returned her Petition for lack of a $252 filing fee. Plaintiff attached the $252 and resubmitted the Petition in May 2015. Nothing happened. Not a word from the Court. For months!

Plaintiff assumed the Lane County District Attorney was having the DNA tested and run through the National DNA Database to find the man who shot her children. She still thinks that. DA Patricia Perlow was doing something for eight months.

Then, suddenly and without preamble, Lane County Judge Charles M. Zennache assigned case number 15-CV-11115 to the case of Downs v State of Oregon (Habeas Case). And, in December this same Judge dismissed the case because it was not titled PETITION FOR POST CONVICTION RELIEF.

A reading of the pleadings and orders makes it clear the Lane County Court knew exactly what Plaintiff was seeking (App. 25). Lane County sent Plaintiff on an 18 month goose-chase that sent the blindfolded goose right back to Judge Zennache, who AGAIN dismissed Plaintiff's request to have the DNA tested (App. 26 ), because 15-CV-11115 was still a Habeas Corpus case and not a Post Conviction case.

Page 13 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

In April 2022, Plaintiff stumbled upon the Oregon DNA Post Conviction Statute while looking for something else. She put together another request to have the DNA tested in the evidence entered into Court as EXHIBIT 15. She even attached a filing fee of $282. Her Petition For Post Conviction Relief was entered as <u>Downs v Oregon</u>, Lane County Case Number 22-CV-16308 on 5-18-22. Again, nothing happened. Not a word from the Court. For months!

This time, though, Plaintiff has learned a few things about the new world out there. Things have changed in the 40 years Plaintiff has been locked up. Computers run everything now!! No more secrets.

Plaintiff's brother went online to examine the activity in her DNA case:

```
5-18-2022 --- case assigned to Judge Charles Zennache
8- 8-2022 --- case assigned to Judge C. E. Carlson
10- 4-2022 --- case assigned to Judge Jay A. McAlpin
```

A whole lot of Judges. A whole lot of nothing. Well, not absolutely nothing. Lane County returned Plaintiff's $282 filing fee because ORS <u>138.690 (4)</u> says; "The court may not charge a fee for any filing under ORS 138.688 to 138.700". So how did the Lane County Court miss:

<u>ORS 138.690 (1)</u> A person may file ... a petition requesting the commencement of a DNA test proceeding and requesting that the court appoint an attorney for the purpose of determining whether to file a motion under ORS 138.692 for the performance of DNA testing on specific evidence ...

<u>ORS 138.694 (1)</u> A person described in ORS 138.690 is entitled to counsel during all stages of the proceedings ...

Page 14 -- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

Plaintiff did request that an attorney be appointed to represent her.  In fact she was so convinced the Lane County Court had to abide by the mandatory language of the Law that she wrote to the Public Defender's Office in Eugene, Oregon to get the ball rolling.  They didn't answer.  She wrote again (App. 27). They still didn't answer.  Her third letter was returned with the notation "Cannot be delivered as addressed".  Hmmmm.

Plaintiff wrote to the Innocence Project (App. 28).  DNA is their thing.  The Oregon Innocence Project wrote back (App. 29):

> "Based on the record, there are at least two
> types of physical evidence that were recovered
> near the crime scene ... you may want to pursue
> testing of this evidence ... that could be very
> helpful to your case ... [BUT] ... the Oregon
> Innocence Project will not represent you as
> counsel in your continued quest for exoneration".

WOW!!!  And there it is.  Clear as day.  The DNA will prove Plaintiff has been telling the truth for 40 years, but Lane County Oregon does not want Christie and Daniel Downs to know who really murdered their sister.  Lane County is plugging away behind the scenes convincing everyone to turn a blind eye to the truth just so their conviction of an innocent woman is not overturned.

> United States v Nixon, 418 U.S. 683, 709;
> 94 S.Ct. 3090; 41 L.Ed 2d 1039 (1974)
> "We have elected to employ an adversary system of
> criminal justice in which the parties contest all
> issues before a court of law.  The need to develop
> all relevant facts in the adversary system is both
> fundamental and comprehensive.  The ends of criminal
> justice would be defeated if judments were to be
> founded on a partial or speculative presentation of
> the facts.  The very integrity of the judicial system
> and public confidence in the system depends on full
> disclosure of all the facts ... "

In <u>TOWNSEND v SAIN</u>, 372 U.S. 293; 83 S.Ct. 745, 757 (1963), the Supreme Court listed several reasons State errors REQUIRE the Federal Court to conduct an evidentiary hearing.  Plaintiff lists the pertinant reasons as follows:

      \*\*\*  The State's determination is not supported by the record.

      \*\*\*  There is a substantial allegation of newly discovered evidence.

      \*\*\*  The State did not afford Plaintiff a full and fair hearing.

Plaintiff Petitioned for Post Conviction Relief to have evidence in her case tested for DNA to identify the man who actually committed the crime for which she's been wrongfully incarcerated 78% of her adult life.  Oregon Statute, ORS 138.694 requires the Court to appoint an attorney to represent Plaintiff in the DNA Post Conviction proceeding to make sure Lane County wouldn't deny Plaintiff relief on a legal technicality.

Lane County didn't do that.  The Lane County Court denied Plaintiff relief without appointing an attorney and without conducting a Post Conviction Hearing to expedite the unlawful proceeding.

THEN --- AFTER PLAINTIFF WENT LOOKING FOR HER OWN ATTORNEY IN LANE COUNTY --- the Lane County Court contacted a Law Firm in Portland, Oregon to represent Plaintiff on appeal of their illegal judgment.  Seriously?!  Why would the Court do that after denying Plaintiff legal representation in a Lane County Court?

The answer is obvious to anyone who wants to see the truth. Read the attorney's letter (<u>App. 30</u>):

"The Lane County Circuit Court appointed us to
represent you on PCR appeal ... I will briefly
summarize the PCR appeal process [process laid
out] ... Sometimes weeks or months may pass without
you hearing from us.  Do not be concerned ...
the Court of Appeals routinely grants transcribers
... us and the State extensions of time to file
the briefs".

OOps, there it is.  Plaintiff's appeals usually take one to
two years to resolve.  It's obvious Lane County appointed an
appellate attorney to assure Plaintiff will remain in prison
another two years before a Federal Court requires Lane County to
produce the evidence for DNA testing.

Look again at the attorney's letter.  Lane County told
O'Connor Weber LLC that Plaintiff wanted to appeal the judgment
denying her post-conviction relief.  That's not exactly true.
Plaintiff would've appealed the Lane County judgment, but the
Court held it past the time of her ability to file a timely
"Notice of Appeal".  Plaintiff was resolved to filing a Civil
Rights Case in this Court.  That is who she was looking to
represent her.  Federal Attorneys to sue Lane County for YEARS
of shenanigans exactly like this.  And that is the reason Lane
County got up off their hinnies and appointed Plaintiff an attorney
to tie her up in State Court for two more years, AFTER denying her
an attorney required by law to represent her in all stages of
her DNA Post Conviction Hearing.

RHODEN v ROWLAND, 10 F3d 1457, 1460 (9th Cir. 1993)
The Ninth Circuit Court Of Appeals required an
evidentiary hearing after Plaintiff developed
a record of prejudice.

Page 17 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

Plaintiff now has an attorney to represent her in a State Appeal of Lane County's unlawful judgment in <u>Downs v Oregon</u>, Case Number 22-CV-16308.  Nothing prevents Plaintiff from making a collateral attack in her DNA case for Constitutional Violations perpetrated by Lane County to deny her Right to Due Process.

Lane County has known since 2015 that the DNA evidence in her case exonerates Plaintiff.  They've known the truth and have made a concerted effort to ignore, dismiss, and outright sabotage Plaintiff's Statutory Right to be vindicated by the evidence the State entered in her case and identified as EXHIBIT 15.  The evidence mattered in 1984 and it matters today.

Plaintiff's Dad died in 2017.  Had Lane County performed the DNA test requested by Plaintiff in 2015, they would've had two years together before he died.  Plaintiff's widowed, 85-year-old Mom wants to spend her last days with her 67-year-old daughter at home.

Lane County's stubborn refusal to NOT abide by Oregon Statute has caused Plaintiff and her Family extraordinary pain, suffering, and financial cost.

## VI. PRAYER FOR RELIEF

Plaintiff prays this Court will ORDER a DNA test of State's EXHIBIT 15 (chewed gum);

Plaintiff further prays this Court for an ORDER directing Lane County Oregon to compensate her for the pain and suffering they've inflicted on her since 2015.

Page 18 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

Plaintiff lastly prays for such other relief this Court deems just.

I swear under penalty of perjury the foregoing is true.

Dated the 14th day of January, 2023.

Elizabeth Diane Downs

---

### CERTIFICATE OF MAILING

I certify a true copy of this CIVIL RIGHTS COMPLAINT was placed in the mail on 1-14-2023, addressed to the following:

Oregon Attorney General
1162 Court Street NE
Salem, OR        97301-4096
(503) 947-4700

Lane County DA Patricia  Perlow
125 E. 8th Avenue.
Eugene, OR        97401

Elizabeth Diane Downs   W49707
CCWF     512-02-1L
PO Box 1508
Chowchilla, CA        93610-1508

Page 19 --- CIVIL RIGHTS COMPLAINT (Lane County Oregon)

APPENDIX

1. Plaintiff's letter requesting Court's Order to Dismiss
2. Court's letter responding to Plaintiff's request
3. Court's GENERAL JUDGMENT TO DISMISS

4. 1983 Evidence Report (chewed gum and murder casings)
5. 1984 Trial EXHIBIT 15 (chewed gum)
6. Lane County maintains evidence in murder cases forever

7. Plaintiff didn't fire a weapon
8. Plaintiff didn't hold a gun
9. Judy Patterson lied to the jury
10. Plaintiff didn't rinse her hands of gunshot residue

11. 1983 Fingerprint report
12. Prosecutor and Defense Counsel agreed to not use fingerprints

13. Daniel's hospital reports reporting the "mean man" who shot him
14. Christie's sketch of the shooter holding the gun in his left hand
15. Sketch of interior of the car (crime scene)
16. Photos od Diane with longer hair a week after the shooting
17. Christie's sketch of mom wearing her plaid shirt

18. Jim Pex manufactured false evidence (ballistics)
19. Pex used Rugers he got from his firearms expert in Salem

20. Jim Jagger tried to get police reports before trial
21. Roy Pond testified the police reports supported the defense
22. Lane County said there are no police reports
23. Police Report dated 5-21-1983 (shooter's confession)
24. Jim Jagger's Affidavit Lane County didn't give him that report

25. Judge Zennache dismissed Habeas Corpus DNA case in 2015
26. Judge Zennache dismissed DNA case in 2015
27. Plaintiff's letters to Public Defender seeking representation
28. Plaintiff's letter to THE OREGON INNOCENCE PROJECT
29. Oregon Innocence Project's letter to Plaintiff
30. Jed Peterson's letter to Plaintiff (Lane County Court appointed
    him to represent Plaintiff on appeal after denying Plaintiff
    legal representation on DNA Post Conviction case)

OCTOBER 30, 2022

CLERK OF THE COURT
LANE COUNTY COURTHOUSE
125 E. 8TH AVENUE
EUGENE, OR 97401

IN RE: DOWNS V GREGON, CASE NO: 22-CV-16308

DEAR CLERK:

MY BROTHER CHECKED THE STATUS OF MY DNA CASE + DISCOVERED JUDGE McALFIN DISMISSED MY PETITION. THAT WAS TWO WEEKS AGO AND I'VE STILL NOT RECEIVED A COPY OF THE ORDER.

THIS IS THE SECOND TIME I'VE NEEDED TO REQUEST A COPY OF A COURT ORDER (TO FILE A NOTICE OF APPEAL) FROM THIS COURT. PLEASE SEND ME A COPY OF THE "ORDER TO DISMISS" IN THE ABOVE ENTIRED CASE.

THANK YOU.

ELIZABETH DIANE DOWNS W49707
CCWF 513-02-1L
PO BOX 1508
CHOWCHILLA CA 93610-1508

APP 1



**CIRCUIT COURT OF THE STATE OF OREGON
FOR LANE COUNTY
LANE COUNTY COURTHOUSE
125 E. 8th AVENUE
EUGENE, OREGON 97401-2926**

*rec'd
11-21-22*

November 9, 2022

Elizabeth Diane Downs W49707
CCWF 512-02-1L
PO Box 1508
Chowchilla, CA 93610-1508

RE: Lane County Circuit Court Case number 22CV16308

Dear Ms. Downs,

Lane County Circuit Court received a request for records the court may hold. Please see below information. For this request, copies have been provided free of charge because it is more convenient for the court. However, future copy requests will be charged at $0.25 cents per page. A certification of documents will be $5.00 per document. If you have any questions, please feel free to contact the person listed below.

- General Judgment of Dismissal in Lane County Circuit Court case 22CV16308

Have a great day!

Sincerely,

Court Clerk
Lane County Circuit Court
Archives/Records
125 E 8th Ave
Eugene, Oregon 97401

App 2

rec'd
11-21-22

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF LANE
125 E. 8th Ave.  Eugene Oregon  97401

**Case No:** 22CV16308

Elizabeth Diane Downs
_____
                    Plaintiff

**GENERAL JUDGMENT OF
DISMISSAL**

            v.

State of Oregon
_____
                    Defendant

THIS MATTER came before the Court on its own motion, the Court having reviewed the file, and the Court being otherwise fully advised;

IT IS HEREBY ORDERED AND ADJUDGED that the above-entitled case is dismissed in its entirety.

10/3/2022 3:04:32 PM

**Jay A. McAlpin, Circuit Court Judge**



App 3

OREGON STATE POLICE—Crime Detection Laboratory
1500 Valley River Rd., Eugene, Oregon

Agency Case No. _83-_

State Laboratory No. _E-_ _20 836_

EVIDENCE TRANSFER REPORT (Request for Lab Analysis)

COUNTY OF VENUE _Lane_

OFFENSE _Homicide_

OFFENSE DATE _5/19/83_

INVEST. AGENCY _Lane SID_

INVEST. OFFICER _Rowlands_

VICTIM/COMPLAINANT (Establishment and/or Individual):

ADDITIONAL EVIDENCE

DOWNS, DIANE ELIZABETH

DOWNS, SHERYL LYNN

SUSPECT INFORMATION:

EVIDENCE SUBMITTED: (Describe)

"out of road" - E-16 -

(2) .22 lead bullets

(4) .22 ammo casings

(2) .22 _____

"out of ditch" - E-16

(1) _____

_____ Bag _____

EXAMINATION(S) REQUESTED:

BREATHALYZER TAKEN: _____ YES _____ NO  (BLOOD ALCOHOL)

OFFICER'S REPORT REQUESTED ON PHYSICAL EVIDENCE CASES

DATE _____

SIGNATURE _James W. ___

APP 4

938

J. Pex - D                          1140

1          State's Exhibit No. 15 is some ~~strawberry~~

2    flavored bubble gum that I found on the roadway near

3    where the cartridge casings were found.

4          Q.    Perhaps we could go on to Number 21 at this

5    time.

6          A.    Those may not be in the courtroom right now.

7          Q.    Let's move to 35.

8          A.    State's Exhibit 35 is the rubber floor mat

9    that was on the right rear side of the Downs' vehicle.

10         Q.    Did you do any testing of it?

11         A.    Yes, I did.

12         Q.    For what purpose?

13         A.    I examined this floor mat under the

14    microscope for trace evidence materials and also

15    obtained some vacuumings from this.

16              What I did observe on this floor mat were

17    some gunpowder particles.

18              State's Exhibit 36 is the floor mat from the

19    left front floor of the Datsun. This would be the

20    driver's side.

21         Q.    Did you likewise examine it?

22         A.    Yes, I examined it microscopically, and on

23    this particular item I did not find any gunpowder

24    particles.

25              This is State's Exhibit 37. This is the

_DNA WOULD IDENTIFY THE MAN WHO SHOT US,_

[ APP 5 ]

Wendy R. Willis, OSB No. 94496
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, OR 97204
(503) 326-2123

Attorney for Petitioner


# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ELIZABETH DIANE DOWNS, | ) | CV No. 96-900 HA |
| | ) | |
| Petitioner, | ) | AFFIDAVIT OF |
| | ) | WILLIAM J. TEESDALE |
| vs. | ) | |
| | ) | |
| SONIA HOYT, Superintendent, | ) | |
| Oregon Women's Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

| | |
|---|---|
| STATE OF OREGON | ) |
| | ) ss. |
| County of Multnomah | ) |

**I, William J. Teesdale, being duly sworn, depose and say:**

A.   Introduction

I am a staff investigator employed by the Federal Public Defender for the District

PAGE 1 -   AFFIDAVIT OF WILLIAM J. TEESDALE



62

of Oregon. I am also an attorney licensed to practice before the bars of England and Oregon. In September 1996 I was assigned to work on Diane Downs' federal habeas corpus case, *Downs v. Hoyt*, CV No. 96-900 (HA).

B.    **Attempts To Obtain Access To Evidence**

On January 15, 1997, I telephoned Laureli at the Lane County Sheriff's Office evidence room. I identified myself to Laureli as an investigator with the Federal Public Defender's office and asked her some general questions about access to evidence and documents in closed criminal cases. Laureli told me that in most cases, after a defendant's direct appeal has finished, the evidentiary material is kept for a period of 30 days. **Laureli told me that in murder cases, most items are usually kept forever.** Laureli said that the **process to view evidence in a closed criminal case was by making an appointment through her.** I then requested such an appointment to view the remaining evidentiary material in the Diane Downs case. Laureli told me that she would check to see what was still available and call me back.

About half an hour after my initial telephone call, I received a call back from Laureli. Laureli told me that she had spoken to Detective Doug Welch in the Lane County Sheriff's Detective Unit who said that my request should go through the Lane County District Attorney's office. Laureli said that the information she had given me during the first telephone conversation was inaccurate and that it was the usual practice for requests to look at evidence to be referred to the district attorney's office. Laureli apologized for

PAGE 2 -    AFFIDAVIT OF WILLIAM J. TEESDALE    App 6

giving me incorrect information.  Laureli suggested that I contact Assistant District Attorney Fred Hugi and make the request through him.

After my conversation with Laureli, I telephoned the Lane County District Attorney's office and left a message for Mr. Hugi to contact me.  About 10 minutes after leaving that message, I received a telephone call from Detective Doug Welch with the Lane County Sheriff's Office.  Detective Welch explained that he was calling me about my request to review the Downs evidence.  I explained to Detective Welch the nature of my request, and he asked when I would want to come and look at the material.  Detective Welch also said that I should contact either Fred Hugi or another Assistant District Attorney, Paul Graebner, at the district attorney's office with my request.  I told Detective Welch that I was hoping to come and look at the material in the following two weeks and that I would make the request to either Mr. Hugi or Mr. Graebner.

Detective Welch also told me that he could not remember what material was left in the Downs case, given the passage of time.  Detective Welch said that he thought that the Lane County Sheriff had much of the material but that he was almost certain that the car had been sold or otherwise disposed of several years ago.  Detective Welch said that he thought there was an evidence log which would give an inventory of the remaining evidence.  I then asked Detective Welch for a copy of the log, and Detective Welch responded that he would check with Laureli in the evidence room.

PAGE 3 -    AFFIDAVIT OF WILLIAM J. TEESDALE    App 6

leo

After my conversation with Detective Welch, I left a further telephone message for Fred Hugi and a detailed message for Assistant District Attorney Paul Graebner.

On January 22, 1997, after receiving no response to my telephone messages, I wrote a letter to Detective Welch suggesting that I come down to look at the remaining material in the week beginning February 3, 1997. A copy of that letter is attached as Exhibit B. On February 5, 1997, having received no response to my letter, I contacted Detective Welch at the Lane County Sheriff's office. Detective Welch told me that he had spoken to Assistant District Attorneys Hugi and Graebner, and their feeling was that we were "trying an end run around the attorney general's office." Detective Welch said because of that, the district attorney was refusing access to the material, and any request should be made through the state attorney general's office. After my telephone conversation with Detective Welch, I wrote a further letter to him on February 12, 1997, responding to his suggestion that we were "attempting an end run around the attorney general's office" and asking that we be provided a copy of the evidence log. I received no response to my letter of February 12, a copy of which is attached as Exhibit C.

On March 25 and 26, 1997, I made written Oregon Public Records Act requests to the Lane County Sheriff's office, the State Police forensics laboratory, the State Police District Patrol Office, and the Springfield Police Department. Copies of those requests are attached as Exhibits F, G, H, and I. On April 9, 1997, I received responses from both the Springfield Police Department and the Lane County District Attorney's office. The Lane

PAGE 4 -   AFFIDAVIT OF WILLIAM J. TEESDALE



59

County District Attorney declined to make the records available, stating that the records were exempt from disclosure under the Public Records Act on the basis of continuing litigation. The Springfield Police Department advised me that the police reports they maintained on the case were available either in person or by requesting them through the mail. After sending a further letter to the Springfield Police Department, together with my check for the copies, the Springfield Police Department records were provided to me on May 12, 1997.

On June 12, 1997, I had a telephone conversation with Terry Bekkedahl, the supervisor of the Oregon State Police forensics laboratory. I explained to Mr. Bekkedahl that I was calling to inquire about my public records request, because I had received no response. Mr. Bekkedahl told me that he had received my March 26 request and that it was still sitting on his desk. Mr. Bekkedahl said that after he received the request, he spoke to Assistant Attorney General Lynn Larsen about how he should respond. Mr. Bekkedahl told me that Lynn Larsen said that many different people in the state police had received the same or similar requests. Mr. Bekkedahl told me that Lynn Larsen told him that the local district attorney's office took the position that the requests should be denied because there was continuing litigation and that he had the same opinion. Mr. Bekkedahl said that he was sorry that I had not received a formal response from the Oregon State Police and that he would call headquarters in Salem about that. Mr. Bekkedahl also

PAGE 5 -    AFFIDAVIT OF WILLIAM J. TEESDALE

App 6

58

mentioned that he had assumed because of Attorney General Larsen's comments that

someone at the state police in Salem would have written a formal response.

C.    Attempts To Speak With Trial Counsel

After leaving two telephone messages with Diane Downs' trial lawyer, James

Jagger, I had a conversation with Mr. Jagger on November 19, 1996. I identified myself

to Mr. Jagger and explained that I wanted to review his files on his representation of Diane

Downs and also discuss his recollection of the case. Mr. Jagger told me that he was

perfectly willing to give us access to the documents but that he was not willing to discuss

the case at that point, since he might have to testify.

D.    Attempt to Interview Christie Hugi

On November 26, 1996, Assistant Federal Public Defender Wendy Willis and I

went to Christie Hugi's (formerly Downs) residence in Eugene. We introduced ourselves

to Ms. Hugi, provided her with our business cards, and explained our wish to talk to her

about the case. Ms. Hugi told us that she was not sure whether or not she should talk to

us. As we continued to discuss the matter with Ms. Hugi, we were interrupted by one of

her roommates who asked Christie whether or not she wanted her to make us leave. I then

asked Ms. Hugi whether or not she, indeed, wanted us to leave, and she responded: "No,

I'm shocked. I just didn't know any of this was going on." After some further discussion

and more emotional comments from Ms. Hugi's roommate, I suggested to her that it was

PAGE 6 -    AFFIDAVIT OF WILLIAM J. TEESDALE    

57

probably best that we leave and give her a chance to think about our request.  Ms. Hugi

agreed with that suggestion, so we concluded the conversation.

_____

William J. Teesdale

SUBSCRIBED AND SWORN TO BEFORE ME this 6th day of JUNE, 1997.

OFFICIAL SEAL
TAMMY LEA REYNOLDS
NOTARY PUBLIC - OREGON
COMMISSION NO. 029260
MY COMMISSION EXPIRES OCT. 31, 1997

_____
Notary Public for Oregon

PAGE 7 -    AFFIDAVIT OF WILLIAM J. TEESDALE                    App 6

56

## Department of State Police

CRIME DETECTION LABORATORY

650 ROYAL AVENUE SUITE #11 MEDFORD OREGON 97501

August 26, 1983

*Test taken 5-19-8-*

David N. Burks, Sheriff
Lane County Sheriff's Department
125 E. 8th Avenue
Eugene, OR  97401

Re:  HOMICIDE
Victim:  DOWNS, CHERYL  LYNN
Suspect:  DOWNS, DIANE  ELIZABETH
Agency Case #83-3268
C.D.L. #'s E-20,836 and #A-11,168

On August 8, 1983 this laboratory received by U.P.S. from Oregon
State Police, Crime Detection Laboratory, Eugene, the following:

A sealed GSR-AA kit reportedly containing hand swabs from James
O. Pex.

No significant amounts of Antimony and Barium were detected on
these swabs.  Therefore, it could not be determined if the subject
recently discharged a firearm.

John C. Williams, Superintendent

by
Bradford C. Telyea, Lieutenant
247-90

BCT/pll

*testimony in court was NO Antimony + barium*

cc:  Oregon State Police, Crime Detection Laboratory, Eugene
     Lane County District Attorney, Eugene

This is certified to be a true copy of
the original report prepared by the
undersigned
By

Appendix  7

R. Antoine – D                1363

1   Hospital in connection with the shooting on that

2   evening?

3       A.   Yes, I did.

4       Q.   While there, did you contact the defendant

5   Elizabeth Diane Downs?

6       A.   Yes, I did.

7       Q.   And did you perform on her hands what's

8   known as a trace metal test?

9       A.   Yes, I did.

10      Q.   Tell us how you did that and what the

11  results were?

12      A.   I had sometime earlier obtained a chemical

13  from the Oregon State Police Crime Lab the purpose of

14  which is to spray skin to detect the presence of trace

15  metals left after someone has touched or held

16  something metallic.

17          The spray that I used causes a discoloration

18  of the skin, having a different color for different

19  types of metals.

20          That night I sprayed the defendant's hands

21  or one hand and had a negative result.   I didn't find

22  any discoloration.

23      Q.   What time did you do that, do you remember?

24      A.   A guesstimate, approximately 1:00, between

25  1:00 and 1:15.



(APPENDIX 8)

Case 6:23-cv-00119-MK   Document 1   Filed 01/24/23   Page 36 of 89

May 1984

1    personnel because we still needed more help.

2           At that time while I was on the phone to the

3    police, Mrs. Downs had requested to make a call to her

4    parents and I said that as soon as I was done with my

5    phone calls to the doctors necessary and the police,

6    then she could call.

7         Q.    Which police agency did you call?

8         A.    Springfield.

9         Q.    Why is that?

10        A.    Well, I didn't know where it had occurred.

11   She had said at that point that it was Marcola, but

12   there were segments of that area that are still within

13   Springfield jurisdiction.

14          So I just called the number I knew off the

15   top of my head.  So I just automatically dialed the

16   one I always dialed in reporting anything else.

17        Q.    What happened then?

18        A.    I explained to Diane that I had to call the

19   police, and she said yes that "I want them called in.

20   I need to call my parents."

21          And I told her again that I would have to

22   make my calls first and then as soon as I was done, I

23   would give her the phone and she could call.

24          While I was on the phone to the police she

25   asked about a restroom, and it's right behind my desk

LIAR          SEE APP. 10



APPENDIX 9

1    so I pointed her in that direction.  She came out

2    while I was still on the phone and went toward the

3    trauma area.

4        Q.    This restroom, did you see or hear anything

5    when she went in there?

6        A.    I did not see anything.  I heard running

7    water, but that was all.

8        Q.    Any cups in that room?

9        A.    No, there are not.

10       Q.    Was the door open or closed?

11       A.    Open.

12       Q.    What happened then?

13       A.    I called her back from the trauma area to

14   which she was heading, had her sit on the stool again

15   and completed my calls and then handed her the phone

16   and dialed her parents' number.

17           She talked on the phone.  I made sure she

18   was at my desk.  I went to the trauma area to find out

19   if there was anything I could do in there.

20           Dr. Mackey requested at that time that I

21   call Dr. Foster, a pediatrician-surgeon from Eugene,

22   so I left the trauma center, went into the back room

23   and used the phone back there to call Dr. Foster.

24       Q.    What was happening?  You've told us what you

25   were doing, and I take it Mrs. Downs was kind of in

Appendix 9    (continued)

83-3268
Project 100
Murder/Attempted Murder
T/Patterson, Judith Ann WFA 01/06/54
1551 "B" St.
Springfield, OR
Phone: 726-6862
Employed: McKenzie Willamette Hospital, ER Secretary/Sacred Heart Hospital, Pediatric Secretary

On 07/12/83 at approximately 1330 hours I contacted Judith Patterson via telephone. At that time I questioned regarding her contact with Diane Downs at McKenzie Willamette Hospital on May 19, 1983. Ms. Patterson indicated that she had been the first person that had attended to Diane's injury. She went on to relate that she removed a towel from Diane's arm, poured betadine on and around the wound and then dressed the injuried arm. Ms. Patterson further advised that she had remained with Diane from the time Diane and her children entered the emergency room up until the time that Diane returned to the scene with the Sheriff's Deputies. She also stated that she could not recall Diane ever asking her to use the restroom, however, Diane had walked away out of her sight on several occasions during this period of time.

On 07/19/83 at 1035 hours I re-contacted Judy Patterson via telephone at Sacred Heart Hospital. At that time I requested that she relay the sequence of events involving the Downs family which occurred on May 19, 1983. She recalls Diane Downs entering the emergency room stating something to the effect, "My kids were shot." Diane then went back outside and returned moments later as medical personnel were carrying her children into the emergency room. Ms. Patterson recalls she then called out a, "Code 4" which is a request for medical personnel to respond to an emergency. Ms. Patterson advised she then began calling available surgeons, the anesthesiologist and various other medical personnel. She went on to relate that while making these calls she had Diane sit next to her desk. After she had contacted all the required medical staff, Ms. Patterson stated to Diane, "I'm going to call the police." Diane responded that she wanted them called and there was a brief discussion as to where the crime had occurred. Since Diane was not sure of the location, Ms. Patterson decided to call the Springfield Police Department. Immediately after calling the police department advising them of the shooting Ms. Patterson then began making, "In house calls." At that time Diane began stating that she wanted her parents notified. Ms. Patterson informed her that her main priority at that time was to obtain assistance for the children and then she would get someone for her, referring to Diane. After making the, "In-house calls," for more personnel Ms. Patterson then dialed the telephone for Diane and allowed her to speak with her parents. Ms. Patterson further advised that normally she would make the initial notification to the family however, she felt that Diane was very calm and would have no problem communicating. She also indicated that she left her desk for a short period of time while Diane was conversing with her parents and Ms. Patterson did not overhear a majority of the conversation.

APPENDIX 10

State of Oregon
Department of State Police
Salem, Oregon 97310

REPORT OF THE
BUREAU OF CRIMINAL IDENTIFICATION
LATENT FINGERPRINT SECTION

DATE: March 28, 1984

TO: Mr. Dave Burks
Lane County Sheriff
Eugene, OR 97401
ATTN: Det. Douglas E. Welch

AGENCY CASE NO. _____ 83-3268 _____

LATENT CASE NO. _____ 45604 _____

DOWNS, CHRISTIE ANN - Victim
DOWNS, CHERYL LYNN - Victim
RE: MURDER/ATTEMPTED MURDER    05/19/83    DOWNS, STEPHEN DANIEL - Victim

REFERENCE: Incident Report by Sgt. Rutherford dated 05/20/83.

RECEIPT & DISPOSITION OF EVIDENCE: Seized by writer on 09/08/83. One inked fingerprint card
and one inked palm print card were received by mail on 03/13/84 and they are being
returned by mail with this report.

EVIDENCE:
 2 - Rolls of 120 film (45604 P-1 thru P-24) (retained in this case file)
13 - Latent print lift cards (45604 P-1 thru P-24) (retained in this case file)
 1 - Inked fingerprint card
 1 - Inked palm print card

EVALUATION:
7-Latent fingerprints and 10-latent palm prints contained a sufficient amount of
clear ridge detail for identification purposes. They were marked 45604 P-1, P-3
thru P-17, and P-24, and photographed. Latent prints marked 45604 P-2 and P-18 thru
ANALYSIS:  P-23 were voided due to insufficient clear ridge detail.

On 09/08/83 writer processed a red 1982 Nissan Pulsar NX 2-door sedan, Arizona
license BJY 787, VIN JN1NM24S7DM111317, located at the County Shops, Eugene, OR.
No physical evidence was seized from the vehicle.

The latent fingerprints and palm prints have been compared with the inked finger-
prints and palm prints of the following suspect, but no identification was effected.

DOWNS, ELIZABETH DIANE    DOB 08/07/55

Photographic copies of the latent prints are being retained in this case file.

John C. Williams, Superintendent

By ⟨signature⟩

Jon D. Painter, Trooper

JDP:nj1
Copy to:
Lane Co. DA



THE UNDERSIGNED, legal keeper of records, State Police, does hereby certify that the copy has been compared by me with the original that it is a true and correct transcript thereof of the whole or of a specified part of said document as appears on file in my official care custody.

In testimony whereof, I have affixed my sig...

PROSECUTOR
HUGI

Fingerprints
1991

1    Q    I guess-

2    A    Both Mr. Jagger and Mr. Reid had access to the

3  car prior to the time that it was washed.  It is also my

4  recollection that the car was tested for fingerprints;

5  that the results were discussed with Mr. Jagger and we

6  concluded that they were not helpful to either side.  That

7  does not refer to anything that happened in the courtroom.

8  That was a pretrial discussion I had with Mr. Jagger.  I

9  received a fingerprint report.  It was inconclusive.  I

10  talked with Mr. Jagger about that and that was it.

11    Q    Okay.  So you basically don't remember a similar

12  conversation being had in court?

13    A    No.

14        MR. GORHAM:  I don't have any more questions

15  at this time, Your Honor.

16        THE COURT:  Cross-examine?

17        MS. WALSH:  Yes.  Thank you.

18

19  HUGI + JAGGER WERE CO-WORKERS IN THE

20  DA's OFFICE BEFORE MY DAD HIRED JAGGER.

21  HUGI MIGHT THINK IT's OKAY TO AGREE WITH

22  JAGGER TO WITHHOLD EVIDENCE FROM THE

23  COURT, BUT I HAVE A PROBLEM WITH MY

      ATTORNEY CONSPIRING WITH THE PROSECUTOR

25  TO WITHHOLD EXCULPATORY EVIDENCE

      FROM ME.


APP 12

00-0700

shot you," he replied. "Mommy shot me," he said. "I thought you said that shot you," I said. "They both shot me," he replied. "... go mad a ..." Beautiful. Throughout the story he kept saying, "Tilly is so sad" "... why is she sad?" Kim Morrison RN

THE ORIGINAL
HOSPITAL RECORDS
WILL BE ENTERED INTO
EVIDENCE DURING TRIAL
IF NEEDED.

... Playing in playroom - suddenly stated "I have to go poop on the toilet" ... but did not pursue this when told he hadn't been pooping in the toilet for a long time & he could go in his diaper. — J. Chase RN
... 12?? ... called for clear yellow urine ... asleep ... spurts of wording he got in the playroom and "be a baby" but was easily ... B. Smith RN



> "WHO SHOT ME?" HE ASKED.
>
> "DO YOU KNOW WHO SHOT YOU?"
>
> "THAT MAN," HE REPLIED.
> "THAT MAN SHOT ME," HE SAID.

500-2200

"It's an owl," he said.
Tommy wanted to sit by the window. He saw an ambulance pull up. The nurse agreed, "Yes, you were," Tommy. "Why?" "Because you were hurt," I replied. "How?" he asked. "Someone shot you," I replied. "Why, I don't know Tommy, they were being mean, I guess - sometimes that happens." "... shot me?" he asked. "I don't know," I replied. "Do you know who shot you?" ... he replied. "... were you playing," ... "outside." He ... in a car?" I asked. "Yes," he replied. "Are you sure?" I asked. ... "That man shot me," he said. "Do you know ... him before?" I asked. ... back, "... Jack," he said. "Did you know him before?" I asked. ... asked. "Let's go back over the story ..." he said. "He went ... listened out and said, "When ..." "... thought that man ..."

DATE 7-13-83

-13-83

...SING CARE RECORD

(APPENDIX 93)

IME AND INITIAL IF ACTIVITY, OBSERVATION, OR | SYSTEMS | OBSERVATIONS. USE ADDITIONAL SPACE ON BACK
S BEEN GIVEN UNEVENTFULLY. | REVIEW | FOR DETAILED CHARTING WHERE INDICATED.
(Initial if | CROSS OUT UNUSED LINES AND SIGN ALL EN-
T ANY CATEGORIES THAT ARE NOT APPLICABLE. | asymptomatic | TRIES.
BACK IF NEEDED FOR NON-ROUTINE CARE OR | Circle & explain
if abnormal).

| | TGDB | Bed/Position | TIME 34-07 |
| Cath/Peri | Inc. | CNS 11/ |
| BM   Guaiac | | Resp. 11/ |
| IV | TXN | CV 11/ |
| NPO p̄ Min | | GI 11/ |
| | | GU 11/ |
| | | MS 11/ |
| | | Integ. 11/ |
| | | Psych/Social 1/ |
| | | DESCRIBE |
| | | PAIN AND |
| | | RESPONSE |
| CNA ___ LPN/RN | | TO Rx   2300–0700   ___ LPN/RN |

TIME 0700

TIME 1100

DESCRIBE
PAIN AND
RESPONSE
TO Rx

DATE 2-14-83

NURSE'S RECORD

SACRED HEART

Appendix 13

-0700

" SEE HOW STRONG MY ARMS ARE?
BUT MY LEGS AREN'T, I CAN'T WALK.
THAT MAN WAS MEAN TO ME."

" HE SHOT ME."

-1500

[illegible handwritten nursing notes]

-2300

[illegible handwritten notes]

DATE ___7-14-83___

7-14-83

SACRE...        ...G CARE RECORD
                GENE

3:0-0700

ON 6-12-1984 @ 10 A.M. PROSECUTOR
HUGI ASKED JUDGE FOOTE TO KEEP
THESE STATEMENTS FROM THE JURY
(T.T. 2866)

THE COURT SO ORDERED (T.T. 2874)
AND THE JURY NEVER HEARD

0700-1500

HE SAID, "THAT NASTY MAN
WITH A GUN SHOT ME."

...would rub his back, but said "Don't touch" my-
...put him, his hole was all better. If asked if he Joster
...I said yes, then he said "that Nasty Man
...shot me" I asked "Do you know who that Man is?"
...said "Jack, like Jack in the beanstalk." I said
...beanstalk is a story. Sonny - he asked "who shot me
...minute I don't know. do you?" "No copey for a minute
...rub my hole" I answered "Dr. Jester fixed your hole"
...want out of this hospital, I want my daddy." I said
...he began asking questions about hospital related
...S. Miamonda)









A RIGHT-HANDED PERSON CANNOT
BEND THE RIGHT ELBOW BACKWARD
TO POINT A GUN AT DAN.







JUNE 1983
TWO WEEKS AFTER
THE SHOOTING. MY
HAIR WAS TO MY
SHOULDERS + NOT
CURLY.

CHRIS KNOWS MY HAIR
HAS NEVER BEEN CURLY
AROUND MY FACE.

JUNE 1984


APP 16

PETERSON WROTE CHERYL

BUT THIS WAS ME,                    7-6-1983

HOLDING UP MY EMPTY

HANDS IN A "DEFENSIVE        EX. B

POSTURE."



CHRISTIE DREW HER MOM WITH

A SHORT SLEEVE PLAID SHIRT.

FULL BODY. LONG HAIR.

ONLY I OWNED A PLAID SHIRT + ONLY

MY HAIR WAS THAT LONG + STRAIGHT.

CHERYL'S HAIR WAS SHORTER + CURLY.



APP 17

6-28-83

Aegon SP 6b #E-20836



E-14A — Two sets of striated marks present on base

- cty case E3 has one such mark in ms comp confirms that the mk on E-3 was made by the same tool working edge.

MK on E-3 base

There are no such marks on E-14B or any other of screws car cty cases.

(see photo)
none taken (no time.)

A RE EXAM HAS CAUSED ME TO RECONSIDER
THE ID — IT SEEMS TO FALL APART AT 4.X OBJ.
PEX
HE CAUSED MARKS TO BE MADE ON THE BASE OF
TEST CARTRIDGES

APP 18

955

CARTRIDGE AND CARTRIDGE CA. WORK SHEET   Lab. Number _____  (14)
(USE CLIS/_____)   Examined by _____  Date 6/27/83

| ITEM # | E-14-A | E-14-B | | | | | |
|--------|--------|--------|---|---|---|---|---|
| ITEM SOURCE | tubular mag in glenfield Rifle | → | | Streated mc. inside of bullet near nose | | rose on 14A |
| CARTRIDGE TYPE | rim fire | rim fire | | also say bullets E | | |
| BULLET WT/STYLE | ▭ | ≠ ⌴ | ←both 14A-B = plain lead — | | | +E |
| FIRED, UNFIRED OR MISFIRED (MF) | unfired | unfired | | | | |
| RESIDUE IN CASE | w/a → | | | | | |
| CASE COMPOSITION | at? Brass | | | | | |
| HEADSTAMP/MANF | U-Rem | U-Rem. | | | | |
| RELOAD(RL) OR REMANF.(RM) | | | | | | |
| TRACE EVIDENCE | N/A → | | | | | |
| DAMAGE | N/A → | | | | | |
| EXAMINER'S ID MARKS | | | | | | |

Sketch cartridge case(s) and indicate location of significant marks (Use abbreviations belo

FIRING PIN=FPN;  EXTRACTOR=EXT;  EJECTOR=EJR;  BREECH OR BOLT=BOB;  CLIP=CL;  MAGAZINE=MA;
IMPRESSION=I;  STRIA=ST;  IDENT=ID;  INCONCL.=IC;  ELIMIN.=EL;  CHAMBER MARKS=CM;  CANNELURES=

| COMPARISONS | CLASS | INDIV | CONCLUSION | REMARKS |
|-------------|-------|-------|------------|---------|
| 14B/E-3 | | | NOT ABLE TO ID | on 14B — no ext me deep in rim & ext edge for of cm me present w 6's although same general coarse agreement is present |
| E-3/E6B | | | INSUFFICIENT AGREEMENT | open, coarse detail limited in E-3 & comp of fine detail didn't result in sufficient ... suf agreement bet ext mks for a pos... using fine detail ISO coarse ext stk |
| E-3/E5 | | | | coarse ... |
| | | | NO ID AGAIN NO ID | fine |

Notes: — 14A rose mks comp w/ E-7 & no id ((E-7 is kind of however) E-7 then comp w E-1 = again no id but E-1 is more ... md than E-7
** properly id cd by end of 2nd day.

Appendix 1B (continued)  94?

OREGON STATE WITNESS — CRIMINALIST

J. Pex – D                    1236

1      Then we have what we refer to as Matthews

2   which is a text on firearms identification that also

3   has combinations of these characteristics in it.

4      What we come down to is we have a best fit

5   of combinations is a Ruger semi-automatic pistol.

6      We have another that's a long shot, but I

7   felt worth including is a Browning pistol.

8      So at this point we have done what is

9   commercially available, and we have to start doing

10   some research on our own.    SERIAL # 14-57485?

11      I obtained several Rugers around town from

12   both sportings goods stores and from our firearms, our

13   weapons expert in Salem.

14      He maintains our weapons that are seized

15   from courts and insures their destruction, but he had

16   a number of Rugers that were ready to be destroyed,

17   and he sent them to me that I might examine them.

18      I also looked at casings from Brownings and

19   from High Standard.  High Standard didn't fit any of

20   these characteristics, but I wanted to be familiar

21   with them anyway.

22      After doing this examination then I

23   contacted various firearms experts around the country,

24   first with the FBI, the Department of Alcohol, Tobacco

25   and Firearms Laboratory.

*(right margin, handwritten, vertical):* ATF WILL HAVE A RECORD OF ALL THESE GUNS, SLATED TO BE DESTROYED, IF 14-57485 IS ONE OF THESE GUNS, THE STATE HAS A HUGE PROBLEM.


APP 19

5-7-1984 WAS THE
DAY BEFORE TRIAL

F I L E D APP-1-1
AT...2.3.5...O'CLOCK Y....M

MAY 0 7 1984

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR ~~~~ County Oregon

THE STATE OF OREGON,                    )   Case No. 10-84-01377 (27)    DEPUTY
                                        )
                    Plaintiff,          )   MOTION
                                        )
        vs.                             )
                                        )
ELIZABETH DIANE DOWNS,                  )
                                        )
                    Defendant.          )

COMES NOW the Defendant, Elizabeth Diane Downs, by and through her
attorney, James C. Jagger, and moves this Court for an order directing
the State of Oregon to disclose to the Defendant all exculpatory
material, including but not limited to all reports generated by the Lane
County Sheriff's Department or other agencies or the District Attorney's
Office relating to the individual who the Defendant has described and
indicated was the perpetrator of the assaults upon her children and
herself and reports and documents and other material relating to a
certain yellow vehicle that was observed by the Defendant prior to the
assault and was missing from the area subsequent to the assault.

In the opinion of counsel, this Motion is well founded in law and
in fact and is not filed for the purpose of delay. This motion is
further based upon the Fifth Amendment of the United States Constitution
which guarantees that no person shall be deprived of liberty without due
process of law. This Motion is further based upon the Affidavit of
counsel attached hereto and by this reference incorporated herein and
the Points and Authorities cited hereafter.

                                JAGGER & HOLLAND
                                Attorneys for Defendant

                                By:
                                    James C. Jagger, OSB 70-070

POINTS AND AUTHORITIES

It is clear that Oregon has enacted certain disclosure statutes
does not mean that the Oregon Legislature was retreating from the
broader pretrial disclosure of exculpatory material required by recent
decisions of the United States Supreme Court, the Oregon Supreme Court
and the Oregon Court of Appeals. Brady v. Maryland, 373 US 83, 83 Sup
Ct 1194, 10 Lawyers Ed., 2nd 215 (1963); State, ex rel Dooley v. Connal,
257 Or 94, 475 P2d 582 (1970); Hanson v. Cupp, 5 Or App 312, 484 P2d 847
(1971). Therefore, the prosecution in Oregon is required as a matter of
due process to disclose voluntarily, at such time as will allow the
Defendant to use it effectively in his or her own defense, all evidence

MOTION -1-

APPENDIX 20

of substantial significance which, if believed, would be seriously considered by the trier of fact in determining guilt or innocence, or would affect sentencing.

It appears clear, based upon the Affidavit of counsel filed herewith, that the State of Oregon, by and through their respective agencies, has acquired information concerning various citings of persons matching the description of the perpetrator of these offenses as set forth by the Defendant and also citings of the particular vehicle that was described by the Defendant. None of this has been disclosed to the Defendant.

JAGGER & HOLLAND
Attorneys for Defendant

By: _____
James C. Jagger, OSB 70-070

MOTION -2-

APPENDIX 20

APP-M-1

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR LANE COUNTY

THE STATE OF OREGON,                    ) Case No. 10-84-01377
                                        )
                    Plaintiff,          ) AFFIDAVIT
                                        )
        vs.                             )
                                        )
ELIZABETH DIANE DOWNS,                  )
                                        )
                    Defendant.          )

STATE OF OREGON )
                ) ss.
County of Lane  )

        I, James C. Jagger, being first duly sworn on oath, hereby depose
and say:

        I am the attorney of record for the Defendant in the above-entitled
matter. I have received a certain disclosure from the State of Oregon,
a great portion of that discovery having been generated basically by the
Defendant and by certain hospital records from the McKenzie Willamette
Hospital. I have received some investigative reports from the Lane
County Sheriff's Department and other agencies. For the most part, none
of those reports deal with any follow-up or contact with persons who may
have contacted the various agencies or about which the agencies may have
contacted other parties and obtained information concerning citings of
potential suspects generally matching the description of the person as
described by the Defendant or citings concerning the yellow vehicle
described by the Defendant.

        Fortunately, through the media coverage of this particular case, a
few of these persons who have contacted the Lane County Sheriff's
Department both reporting persons seen within the general area who
matched the description of the suspect as given by Ms. Downs or who have
seen vehicles in the general area that have generally matched the
description as given by the Defendant, have contacted this office or Ms.
Downs' parent's residence. These various people that I have contacted
have indicated some cursory contact with the Lane County Sheriff's
Department or other agency. For the most part, each of them was
concerned about the lack of follow-up or care taken by the respective
agencies in obtaining their information. I have not received any
reports concerning these individuals from the State of Oregon. I became
concerned about this and therefore attempted to contact members of the
Lane County Sheriff's Department to attempt to find and interview
detectives and other persons who would have made contact with these
persons. While early on in this matter an investigator was hired by the
Fredericksons to do some limited amount of work, because of financial

AFFIDAVIT -1-

APPENDIX 20

APP-M-.

restrictions, the Fredericksons and the Defendant have not been able to retain an investigator for a considerable period of time. They do not have an investigator at the present time because of financial considerations. It is essential that the Defendant receive and be able to review such exculpatory items of evidence that may be in the possession of the State of Oregon or through its various agencies.

I made a number of appointments and attempts to contact members of the Lane County Sheriff's Department. I have not been able to discuss these matters with the Lane County Sheriff's Department, for persons within that Department have indicated their unwillingness to discuss the matter with me. They have indicated either that Sheriff Dave Burks has advised them not to talk to me or that they choose not to discuss the facts of the case with me but will not give a specific reason. I attempted to talk with Doug Welch, who is a detective with the Lane County Sheriff's Department, and attempted to leave a message with Sargeant Louie Hince. Sargeant Hince advised me that he would not leave a message for Doug Welch as he didn't want him to talk to me. My efforts to informally obtain this information have been unsuccessful.

I therefore issued a series of subpoenas for Sheriff Dave Burks and to various persons I believe to believe to be custodians of those various records. I have just this date received a communication from County Counsel that such books and files and reports do exist.

I discussed the matter with the attorney representing the State of Oregon and he has advised me that he will be filing a Motion in Limine to keep from disclosing these matters to the defense. It is my understanding that his position will be potentially to handle the matter by having this Court review these reports and make an independent determination that the same should be disclosed to the defense. It is the position of the Defendant that these matters must all be disclosed to the defense. It is our position that the case is even stronger that the matters should all be disclosed to the defense because of the law enforcement agencies frustration of our attempts to ascertain the facts in this case. State v. Chase, 23 Or App 663, 543 P2d 1104 (1975).

SUBSCRIBED AND SWORN to before me this ___ day of May, 1984.

_____
Notary Public for Oregon
My Commission Expires: 3|10|86.

EVERY LEVEL OF LAW ENFORCEMENT
WORKED TOGETHER TO KEEP POLICE
AFFIDAVIT -2-    REPORTS FROM US.

APPENDIX 20

1      A.   No.

2      Q.   Were there any other reports that you wrote

3  that contained information which at the time the

4  report was made tended to substantiate the defendant's

5  report of the incident?

6      A.   That there was somebody else in the area,

7  you mean?

8      Q.   In any way?

9      A.   The only thing that I had was when somebody

10  would call in and say that they'd seen somebody in the

11  area.  That's all I had to go on when I talked to the

12  people that I made contact with.

13      They saw someone walking on Marcola Road or

14  they'd seen somebody leave the golf course, and I

15  worked from there.

16      They had no idea who it was, and some of

17  them had descriptions and some of them didn't.

18      Q.   Now you say that you eliminated these people

19  as suspects.

20      Did you do that at the time you interviewed

21  or contacted whoever made the report, or did you do

22  that later after all the evidence was gathered?

23      A.   That was later.  That was when my sergeant

24  told me that I could disregard any further follow-up on

25  anybody that was -- that I had reports on.



R. Pond - ReD          192

JUDGE FOOTE:

1    Q.    Are you telling me that then at the time
2    that you made those contacts or wrote those reports
3    that the people described in those reports or the
4    incidents described in those reports still as far as
5    you were concerned may have substantiated the
6    defendant's version of what happened?
7        A.    At the time I would have to assume so, yes.
8    I'm following up on these various leads of people in
9    the area, and I did -- I obtained all the information
10   I could up to the time that Sergeant Hince told me to
11   disregard any further follow-up on anybody.  There
12   wasn't any need for it.
13            THE COURT:  Any further questions?
14
15            FURTHER REDIRECT EXAMINATION (Continued)
16
17   BY MR. JAGGER:
18       Q.    When was that?
19       A.    When he told me that?
20       Q.    Yes.
21       A.    I don't have the exact day, probably in the
22   middle of June or last of June prior to going to the
23   jail.  The shooting was May 19th.
24       Q.    You were still working as a detective then?
25       A.    Yes.

THEY STOPPED LOOKING FOR THE MAN WHO SHOT MY
CHILDREN ONE MONTH AFTER HE KILLED CHERYL.

Appendix BL1          :d)

1   contacts did you reduce to writing?

2       A.   Probably in the neighborhood of 30 to 50.

3       Q.   Were these all in formal reports or simply

4   in some private notes of yours?

5       A.   That would be in report form.

6       Q.   Did you make -- that's the formal -- either

7   handwritten or typewritten reports that are

8   customarily made in your office?

9       A.   Yes.

10      Q.   Did you keep -- were sometimes those made

11  off of other notes that you had taken at the time of

12  your interviews with people?

13      A.   Occasionally, yes.

14      Q.   Are those still retained?

15      A.   I believe those were discarded.

16      Q.   By you?    6 WEEKS AFTER THE SHOOTING

17      A.   Well, when I left in (July) the investigation

18  continued, and there was a lot of miscellaneous things

19  that were thrown away.

20      Q.   Okay.  I guess the question is did you throw

21  it away yourself or you left them?

22      A.   Right, I threw some of the notes away and

23  others have been discarded since.

24      Q.   Some of the sightings of individuals who

25  people felt matched the description of the assailant



Appendix

STEVEN T. WAX
  Federal Public Defender
STEPHEN R. SADY
  Chief Deputy
Steven Jacobson
Colleen B. Scissors
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher

### FEDERAL PUBLIC DEFENDER
### FOR THE DISTRICT OF OREGON

101 SW Main Street, Suite 1700
Portland, Oregon 97204
(503) 326-2123 / FAX (503) 326-5524

44 W. Broadway, Suite 400
Eugene, Oregon 97401
(541) 465-6937 / FAX (541) 465-6975
Reply to: Portland

Michael R. Levine
Dennis N. Balske
Arren Guevara
Craig Weinerman*
Mark Bennett Weintraub*
Charles G. Rogers
Wendy Rae Willis
Gerald M. Needham
Christina Stebbins Dahl
Thomas J. Hester
* Eugene Branch Office

January 22, 1997

Detective Doug Welch
Lane County Sheriff's Office
125 E. 8th Avenue
Eugene
Oregon 97401

Dear Detective Welch:

Thank you for your recent telephone call about the evidence in the Downs case. As you suggested, I left messages last week for both Fred Hugi and Paul Graebner to telephone me about my request to review the remainder of the evidence. I have not heard back from either of them yet.

I understand from my conversation with you, and Loreli in your evidence room, that I need to set up an appointment to look at the material in the Sheriff's custody. I would like to suggest, tentatively, that I do that sometime in the week beginning February 3, barring some objection from the Lane County District Attorney's office.

As I indicated on the telephone, I would also be grateful for a copy of the evidence log that relates to the Downs case. As we discussed, the log should give me a good idea of what evidence is still in existence, and therefore what I can look at.

Please do not hesitate to contact me if there are any problems with this request. Thank you for your assistance.

Sincerely,

William J. Teesdale,
Federal Defender Investigator

cc. Wendy Rae Willis

APPENDIX 22    page 1 of 8

### FEDERAL PUBLIC DEFENDER
### FOR THE DISTRICT OF OREGON

STEVEN T. WAX
  Federal Public Defender
STEPHEN R. SADY
  Chief Deputy
Steven Jacobson
Colleen B. Scissors
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
* Eugene Branch Office

101 SW Main St., Suite 1700
Portland, Oregon 97204
(503) 326-2123 / FAX (503) 326-5524

44 W. Broadway, Suite 400
Eugene, Oregon 97401
(541) 465-6937 / FAX (541) 465-6975
Reply to: Portland

Michael R. Levine
Dennis N. Balske
Arron Guevara
Craig Weinerman*
Mark Bennett Weintraub*
Charles G. Rogers
Wendy Rae Willis
Gerald M. Needham
Christine Stebbins Dahl
Thomas J. Hester
Judith N. Rosenberg

February 5, 1997

Mr. Lynn Larsen
Assistant Attorney General
100 Justice Building
1162 Court Street NE
Salem, OR 97310

Re:  *Downs v. Hoyt*
     Civ No. 96-900 HA

Dear Lynn:

As I told you on the telephone today, I am seeking access to the evidence produced in the investigation of the criminal prosecution of Elizabeth Diane Downs. The Lane County Sheriff's Office has indicated to my investigator, William Teesdale, that they have custody of the evidence. It is my understanding that the evidence is a matter of public record.

After some discussion with the senior investigator on the Downs case, Doug Welch, about how to get access to the evidence, we were referred to Fred Hugi and Paul Graebner of the Lane County District Attorney's office. After several attempts to contact those people, we did not receive a return call. Finally, today, Mr. Teesdale spoke with Doug Welch, who informed him that we could not have access to the information without your approval. In addition, Detective Welch has not responded to our request for a copy of the evidence log.

Of course, we feel we have a right to examine the evidence. However, in the interest of expedience, I request that you inform Lane County that you have no objection to our examining the evidence. This is not something over which I want to

APPENDIX 22 page 2 of 8

February 5, 1997
Page 2


seek a court order. I hope that we can resolve it informally so that we can move
forward in the case. Please contact me at your earliest convenience.

Sincerely,

Wendy R. Willis
Assistant Federal Public Defender

WRW:sms

STEVEN T. WAX
 Federal Public Defender
STEPHEN R. SADY
 Chief Deputy
Steven Jacobson
Colleen B. Scissors
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
* Eugene Branch Office

### FEDERAL PUBLIC DEFENDER
### FOR THE DISTRICT OF OREGON

101 SW Main St., Suite 1700
Portland, Oregon 97204
(503) 326-2123 / FAX (503) 326-5524

44 W. Broadway, Suite 400
Eugene, Oregon 97401
(541) 465-6937 / FAX (541) 465-6975
Reply to: Portland

Michael R. Levine
Dennis N. Balske
Arron Guevara
Craig Weinerman*
Mark Bennett Weintraub*
Charles G. Rogers
Wendy Rae Willis
Gerald M. Needham
Christine Stebbins Dahl
Thomas J. Hester
Judith N. Rosenberg

February 12, 1997

Detective Doug Welch
Lane County Sheriff's Office
125 East Eighth Avenue
Eugene, OR 97401

Dear Detective Welch:

Thank you for relaying to me the Lane County District Attorney's position regarding access to the evidence in the Downs case. You mentioned in our conversation a feeling expressed by the district attorney that we were "attempting an end-run around the attorney general's office." I must say that I am not quite sure what you mean by that comment. As I understand it, the Lane County Sheriff has custody and control of the remains of the evidence in a closed criminal case. Access to that material was requested through the Lane County Sheriff since the Sheriff is the custodian, as is the usual practice in requesting access to public record material.

Regardless of the above, I would still like to obtain a copy of the evidence log relating to the Downs evidence. If you consider that a request for the inventory of evidence relating to Ms. Downs' case should also go through the attorney general's office, please advise me.

Thank you for your assistance.

Sincerely,

William J. Teesdale
Federal Defender Investigator

WJT:sms

APPENDIX 22 page 4 of 8

STEVEN T. WAX
 Federal Public Defender
STEPHEN R. SADY
 Chief Deputy
Steven Jacobson
Colleen B. Scissors
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
* Eugene Branch Office

## FEDERAL PUBLIC DEFENDER
## FOR THE DISTRICT OF OREGON

101 SW Main St., Suite 1700
Portland, Oregon 97204
(503) 326-2123 / FAX (503) 326-5524

44 W. Broadway, Suite 400
Eugene, Oregon 97401
(541) 465-6937 / FAX (541) 465-6975
Reply to: Portland

Michael R. Levine
Dennis N. Balske
Arren Guevara
Craig Weinerman*
Mark Bennett Weintraub*
Charles G. Rogers
Wendy Rae Willis
Gerald M. Needham
Christine Stebbins Dahl
Thomas J. Hester
Judith N. Rosenberg

March 4, 1997

Mr. Lynn Larsen
Assistant Attorney General
100 Justice Building
1162 Court Street NE
Salem, OR 97310

Re:    *Downs v. Hoyt*
       Civ No. 96-900 HA

Dear Lynn:

I am again writing regarding the evidence in the Diane Downs habeas case. At your request and the request of the Lane County Sheriff's Office, I wrote you on February 5, 1997, regarding our request to view the evidence produced in the investigation of the criminal prosecution of Elizabeth Diane Downs.

I spoke with you on the telephone on February 21, 1997, regarding your position on the matter. You indicated at that time that you needed to consult with Lane County. Because of the time constraints of this case, I need to know your position as soon as possible.

I hope that we do not have to litigate this either as a public records request or before the federal court. Please contact me at your earliest convenience so that I can make arrangements to view the evidence.

THE CLASSIC
RUN-AROUND

Sincerely,

Wendy R. Willis
Assistant Federal Public Defender

WRW:sms

APPENDIX 22 page 5 of 8

**HARDY MYERS**
ATTORNEY GENERAL

**DAVID SCHUMAN**
DEPUTY ATTORNEY GENERAL



100 Justice Building
1162 Court Street. NE
Salem. Oregon 97310-0506
FAX: (503) 373-2147
TDD: (503) 378-5938
Phone: (503) 378-6313

DEPARTMENT OF JUSTICE
TRIAL DIVISION

March 6, 1997    1997

Wendy Willis
Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon  97204

Re:  Downs v. Hoyt
     U.S. District Court Case No. 96-900-HA

Dear Wendy:

     I have contacted the Lane County District Attorney's Office
about your request to view the evidence in the Downs criminal
case.  All the trial exhibits were returned to the party who
introduced them at trial.  Consequently, any evidence submitted
by the defense was returned to Jim Jagger.  As far as the
evidence returned to the State, the DA's office will not
voluntarily produce any of the State's evidence for inspection.
The DA's position in all cases on appeal is that no requests
under the Public Records law are granted due to the pending
criminal matter.

                           Very truly yours,

                           Lynn David Larsen
                           Assistant Attorney General

APPENDIX 22  page 6 of 8



**ARDY MYERS**
**ATTORNEY GENERAL**

FEB 20 1998

**AVID SCHUMAN**
**DEPUTY ATTORNEY GENERAL**

101 Justice Building
1162 Court Street, NE
Salem, Oregon 97310-0560
FAX: (503) 373-2147
TDD: (503) 378-5938
Phone: (503) 378-6313

## DEPARTMENT OF JUSTICE
TRIAL DIVISION

February 19, 1998    1998

Wendy R. Willis
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon  97204

Re:  <u>Diane Downs v. Sonia Hoyt</u>
     USDC Civil No. 96-900-ST

Dear Wendy:

This is to follow up on our recent conversation about the discovery ordered from Judge Haggerty.

1.  The District Attorney has the information indicated in the judge's ruling at page 6, paragraph 1.

2.  The Oregon State Police in Salem have the fingerprint information listed in Judge Haggerty's order at page 6, paragraph 2.

3.  The Lane County Sheriff's Office has told to me that there is no "evidence log", as listed in Judge Haggerty's order at page 6, paragraph 3.

4.  Regarding Judge Haggerty's order at page 7, paragraph 5, the Lane County Sheriff's Office has indicated to me that it still has all the reports that were discovered in the state criminal proceedings.  There are no remaining handwritten notes for those reports, because the practice of the office is to replace the handwritten notes with the typed reports once the reports are completed.

In addition, the Sheriff's Office has no existing notes or reports "received by the Sheriff's Office in response to the case's publicity."  Any such notes were made exhibits by the Court in the state criminal proceeding, when Judge Foote reviewed those notes to determine what would be turned over to the defense.  The Court has told the Lane County Sheriff's Office

**APPENDIX  22** page 7 of 8

Letter to Wendy R. Willis
Diane Downs v. Sonia Hoyt
February 19, 1998
Page 2


that those exhibits were destroyed by the Court on August 27, 1987.

5.    I have checked on the transcripts of voir dire. Apparently voir dire was reported. However, the court reporter who handled most of the trial is no longer with the Court, but apparently she is in the area somewhere. She is supposed to get back to me on locating the notes and making a transcript.    I will keep you posted on that issue.

Please let me know when you would like to review that information that is available.    I can make the necessary arrangements.

Very truly yours,

Lynn David Larsen
Assistant Attorney General


JTT26728/LDL/mxl


APPENDIX 22    page 8 of 8

Wendy R. Willis, OSB 94496
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
(503) 326-2123

Attorney for Petitioner

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ELIZABETH DIANE DOWNS, | ) |
| | ) CV No. 96-900 HA |
| Petitioner, | ) |
| | ) AFFIDAVIT OF |
| vs. | ) WILLIAM TEESDALE |
| | ) |
| SONYA HOYT, Superintendent, | ) |
| Oregon Women's Correctional Center, | ) |
| | ) |
| Respondent. | ) |

STATE OF OREGON     )
                      ) ss.
County of Multnomah    )

     I, William J. Teesdale, do solemnly swear and affirm:

     I am an investigator employed by the Federal Public Defender for the District of

Oregon. I am also an attorney licensed to practice before the bars of Oregon and

England. For approximately the past year I have been assigned to investigate the

claims made by Diane Downs in *Downs v. Hoyt*, CV 96-900 HA..

PAGE 1 -    AFFIDAVIT OF WILLIAM J. TEESDALE



APP 22

47

On February 23, 1998, I had a telephone conversation with Detective Doug
Welch of the Lane County Sheriff's office. My call was made in order to confirm a
meeting at the Lane County Sheriff's office set for February 25, 1998.

During my conversation with Detective Welch, I was informed by him that all of
the physical evidence in the Downs case had been destroyed. Detective Welch also told
me that there were no notes of police reports or suspect leads still in existence.

Detective Welch said that any notes that the state appeals court had on suspect
leads were destroyed in 1987.

I responded to Detective Welch that I was surprised to hear that all of the
physical evidence had been destroyed, because we had received a letter from Assistant
Attorney General Lynn Larsen, which indicated that the physical evidence was
available for us to review at the district attorney's office. Detective Welch then
reiterated that all of the physical evidence had been destroyed and that he was not
aware of any evidence in the possession of the Lane County Sheriff's office that would
be covered by our discovery motion. I then indicated to Detective Welch that I would
check with the district attorney's office about whether or not they still had physical
evidence. THE CHELSEA GUM WAS EXHIBIT 15

On February 25, 1998, Assistant Federal Public Defender Wendy Willis and I
went to the district attorney's office and spent several hours examining physical
evidence and exhibits introduced by the state at Diane Downs' trial. After finishing our

PAGE 2 -    AFFIDAVIT OF WILLIAM J. TEESDALE



App 22

76

review at the district attorney's office, **Ms. Willis and I went to the Lane County Sheriff's office and were shown three boxes of documents and photographs** relating to the Downs case. At the outset of our review of this material, we were introduced to **Detective Welch**, who was present to supervise our review.

**I asked Detective Welch whether or not I had misunderstood him when he said that all of the physical evidence had been destroyed, since Ms. Willis and I had spent about four hours reviewing it at the district attorney's office. Detective Welch responded that I must have misunderstood what he said and that he meant that the Lane County Sheriff's office did not have any physical evidence.** Detective Welch then said that the Lane County Sheriff just had "case books" and that there were no notes of police reports or information about leads to other suspects.

**Ms. Willis and I then spent about 2 hours looking through the material contained in three boxes. It was apparent from a cursory review of the documents that there were many notes of police reports, considerable information about leads on other suspects, and a variety of different handwritten and typed logs of evidence.**

On March 4, 1998, Ms. Willis and I returned to the Lane County Sheriff's office and spent a full day copying the material from the three boxes, amounting to about **4,700** pages of documents. We were ably assisted in this task by Lane County Sheriff's Deputy Brian Smeltzer.

PAGE 3 -    AFFIDAVIT OF WILLIAM J. TEESDALE

App 22

45

Although I have not yet conducted an in-depth review of the 4,700 pages

retrieved from the Lane County Sheriff, there are unquestionably many police reports,

notes, and other documents that I have never seen before.

Prior to receiving the documents from the Lane County Sheriff, I had collected

documents about the state investigation from a number of different sources. These

sources include Ms. Downs' family; her trial attorney, James C. Jagger; and her post-

conviction attorney, Steven H. Gorham. The documents provided by Ms. Downs'

family mostly represent the documents from Mr. Jagger's file, which was returned to

the family at the end of his representation. I am familiar enough with this material to

know that the documents from the Lane County Sheriff's office contain many new

phone reports, notes, information on other suspects, and various evidence logs.

WILLIAM J. TEESDALE

SUBSCRIBED AND SWORN TO BEFORE ME this _13_ day of _March_,
1998.

OFFICIAL SEAL
DE WAYNE A. CHARLEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 033497
MY COMMISSION EXPIRES APRIL 4, 1998

Notary Public for Oregon

PAGE 4 -    AFFIDAVIT OF WILLIAM J. TEESDALE

App 22

44

THE SHOOTING
WAS 5-19-83

this report withheld
by State until
April 10, 1998

5-21-83

George Shipman. 3210 Story Bl 683 5262
WMA 5⁰9 straw hat bad complexion, dirty clothing
clutching red hand bag or pack. 3 kids on
bikes were peddling away quickly from
him as he was standing at corner of
Story Bl & Loraine Hwy. There was a small
red foreign car in the area also. spw

Joe Isaac 688-1008 overheard conversation at
work that a co-worker thinks he knows
the suspect but is afraid to give info
due to the "suspect" being affiliated w/
Hell Souls. Isaac works at W side post
office 687-6633 for further info

Jerry Jones no phone lives across from Elmira
field in white house w/ blue trim. Thinks
he saw in man at Richardson park around
1900 hours who looked like the suspect
picture in the paper. Suty was w/ a large
group & drunk. shldr length hair dark brn
wearing beige T-shirt, blue jeans, white tennis
shoes.

30 Settmer. 343-9009. thinks he knows suspect
from picture in paper as art heister. Settmer
has not seen him in several months.

30 refused name. saw a guy that looked like suspect
at 1st & Van Buren. Euy 5⁰9 WMA white cap
plaid coat red marks on neck thinnes face.

1 Edwin E Allen had V.A. benefits for personality
disorder compl knew him at University. Hasn't seen
him in 5 years; saw the newspaper
Frank Lulich 935-3056

1 2120 Lulich doesn't think last name is correct.
he will check further.

5 knows guy lite Olds yellow - lives at 2024
ameranti - may look like suspect.

APPENDIX 23

5003212
Lelo
9120212

Wendy R. Willis, OSB 94496
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, OR 97204
Telephone: (503) 326-2123


# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ELIZABETH DIANE DOWNS, | ) | |
| | ) | |
| Petitioner, | ) | No. CV 96-900 (HA) |
| | ) | |
| vs. | ) | AFFIDAVIT OF |
| | ) | JAMES C. JAGGER |
| SONIA HOYT, Superintendent, | ) | |
| Oregon Women's Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

STATE OF OREGON    )
                   ) ss.
County of Lane     )

I, James C. Jagger, being first duly sworn, depose and state as follows:

1.    I am a member of the Bar of the state of Oregon.

2.    In 1983 and 1984, I represented Elizabeth Diane Downs in her criminal case,

Lane County Circuit Court case number 10-84-01377, and in the related juvenile matters,

Lane County Juvenile Court case numbers 83-232 and 83-233.

PAGE 1 - AFFIDAVIT OF JAMES C. JAGGER                                    (Jagger.aff)



3.    During the course of those cases, I made numerous requests for discovery, including requests for exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 87 (1963). I made specific requests for police reports and notes regarding citizen and law enforcement calls in response to the composite drawing and the description of the yellow car printed and aired in the local media. I also requested all statements made by my client.

4.    Ultimately, I received reports regarding four witnesses who called the police to report seeing a man who matched the description given by Ms. Downs.

5.    On, Friday, April 10, 1998, I met with Wendy Willis, the attorney appointed to represent Ms. Downs in her federal habeas corpus proceeding.

6.    At that meeting, Ms. Willis provided me with a stack of reports she obtained from the Lane County Sheriff's Office. I reviewed those reports to determine whether I received them during discovery. I sorted these reports into three stacks: (1) reports and notes I definitely had not received during discovery; (2) reports and notes that did not look familiar, but I am not sure whether I received during discovery; and (3) reports and notes that I definitely was given access to before trial. Those reports have now been Bates stamped and are attached to this affidavit for reference. The reports I definitely did not receive are stamped with Bates Nos. 9120002 through 9120316; the reports I may not have received are stamped with Bates Nos. 9120317 through 9120386, and the reports I did receive are stamped with Bates Nos. 9120387 through 9120589.

*SEE App 23 9120212*

7.  .  If I had received the notes and reports regarding leads from members of the

PAGE 2 - AFFIDAVIT OF JAMES C. JAGGER                                    (Jagger.aff)



*App 25*

community and other law enforcement agencies, I would have followed up on every lead to locate witnesses to corroborate Ms. Downs' version of events and to try to locate the actual assailant.

8.     I felt I was at a great disadvantage to have been denied access to reports and notes corroborating Ms. Downs' version of events.

9.     I would have used any statements attributed to Ms. Downs in preparing for trial.

_____
James C. Jagger

SUBSCRIBED AND SWORN TO before me this____ day of June, 1998, by James C. Jagger.

_____
Notary Public for Oregon
My Commission Expires: 6-17-01



PAGE 3 - AFFIDAVIT OF JAMES C. JAGGER                     (Jagger.aff)



REC'D
11-13-15

FILED
AT ....2...... O'CLOCK ....1...... M

OCT 30 2015

Circuit Court For Lane County, Oregon
BY

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR LANE COUNTY

ELIZABETH DIANE DOWNS,

                                    Petitioner,

            v.

STATE OF OREGON,

                                    Defendant.

Case No. 15CV11115    DNA CASE

ORDER ASSIGNING
CASE TO THE HONORABLE
CHARLES M. ZENNACHÈ

        THIS MATTER comes before the Court upon the Court's own motion, it appearing
appropriate that this case be assigned, therefore;

        IT IS HEREBY ORDERED this case is assigned to the Honorable Charles M. Zennachè
for all future purposes.


                            _____
                            Karsten H. Rasmussen, Presiding Judge


Prepared by: M. Panter


Cc:        Elizabeth Diane Downs
           CCWF 512-02-2L
           PO Box 1508
           Chowcilla, CA  93610-1508


App 25

PAGE 1 - ORDER ASSIGNING CASE



COPY

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF LANE
125 E. 8th Ave.  Eugene Oregon  97401

Elizabeth Diane Downs
                                    Plaintiff

v.

State of Oregon
                                    Defendant

**Case No:** 15CV11115

**JUDGMENT DISMISSING
PETITON FOR
WRIT OF HABEAS CORPUS**

This matter came before the court on Elizabeth Diane Down's Petition for a Writ of Habeas Corpus.  The court having reviewed the Petition for Writ of Habeas Corpus, Addendum to Petition for Writ of Habeas Corpus, and Second Addendum to Petition for Writ of Habeas Corpus (hereinafter referred to collectively as the Petition).  The Petition contains eight claims for relief:

1.  Partial fingerprints at the crime scene can now be matched with new technology;

2.  DNA on chewed gum found at the crime scene can now be matched;

3.  Fingerprints on Beer cans found at the crime scene can be matched;

4.  Another murder victim found in a beer cooler 19 days later;

5.  Shoeprints at the crime scene may connect to the beer cooler murder;

6.  Forged letter contains clues to identity of real killer;

7.  The trial court did not have the authority to increase the sentence on count 4 from 20 to 30 years.

8.  That the petitioner had been denied her right to a jury trial on any facts that were used to increase the sentence.

On its own motion, the Court hereby denies the Petition as meritless for the following reasons:

A.  The petition fails to comply with the requirements of ORS 34.360(2).

B.  The petition fails to comply with the requirements of ORS 34.360(5).

C.  Claim 2 is the kind of claim that can only be brought in a post-conviction relief proceeding pursuant to ORS 138.690.

D.  Claims 7 and 8 are the kinds of claims can only be brought in a post-conviction relief proceeding and not by Writ of Habeas Corpus.  See ORS 138.540 allowing Writ of habeas corpus only when "a person restrained by virtue of a judgment upon a

App 25

conviction of a crime asserts the illegality of the restraint upon grounds other than the unlawfulness of such judgment or the proceedings upon which it is based..." See also ORS 34.330(3).

THEREFORE, IT IS HEREBY ADJUDGED THAT the Petition is dismissed without prejudice.

Signed: 12/18/2015 03:00 PM

Charles M. Zennaché, Circuit Court Judge

App 25

## WASHINGTON COUNTY CIRCUIT COURT
150 N. 1st Avenue
Hillsboro, Oregon 97124
(503) 846-8888
(503) 846-4863 TTY
For ADA accommodations, call (503) 846-8767

July 6, 2016

Elizabeth Diane Downs
CCWF 512-02-2L
P O Box 1508
Chowchilla, CA 93610-1508

GOOSE CHASE
12-18-2015 TO
7-6-2016

Re: Attached document: petition for Post Conviction Relief (Check # 129250 in the amount of $252.00 is returned to Willadene R Frederickson)

The attached documents are being returned to you for the following reason(s):

☐    No filing fee enclosed.  Please resubmit with $_____.

☐    Incorrect filing fee.  Please resubmit with $_____.

☐    Signature missing on check.

☐    Incorrect payee - should be STATE OF OREGON.

☐    Personal checks are not accepted.

☐    Pleading must be on 8 ½ " x 11" paper.

☐    Incorrect case number.

☐    Case number missing.

☐    Not a Washington County Court case number.

☐    A Petition for Removal to the US District Court has been filed in this case.  All further
      pleadings must be filed with the US District Court.

☐    The Return; proof of service is not an original document.

☐    The Return; proof of service does not have the original summons attached.

☒    **Other:  The PCR case is being filed regarding DNA.  Pursuant to the ORS
      referenced by the petitioner, the case must be file in the county of conviction.
      Thank you.**

APP 26



**CIRCUIT COURT OF THE STATE OF OREGON**
FOR LANE COUNTY
LANE COUNTY COURTHOUSE
125 E. 8TH AVENUE
EUGENE, OREGON 97401-2926

**CHARLES M. ZENNACHÉ**
**CIRCUIT COURT JUDGE**

Audra L. Stewart
Judicial Assistant

Michael Hajarizadeh
Law Clerk

Phone (541) 682-4259
Fax (541) 682-7437

*Rec's*
*9-14-14*

August 30, 2016

Elizabeth Diane Downs
CCWF 512-022L
PO Box 1508
Chowchilla, CA 93610-1508

     Re:    Petition for Post Conviction Relief

Dear Ms. Downs:

     Your recent attempt to file the above referenced matter was brought to my attention by the clerk's office. It appears to raise the exact same claims for relief as those in your <u>Petition for Post Conviction Relief filed April 17, 2015.</u> As you know, I dismissed that Petition as meritless on December 18, 2015. It appears from your accompanying letter that you are now trying to get DNA testing pursuant to ORS 138.690. Unfortunately your "Petition" fails to comply with the procedure authorized in that statute. I have therefore directed the Clerk to return your filing and the accompanying check for the filing fee. <u>If you wish to pursue the remedy provided for in ORS 138.690, you need to follow that procedure.</u>

*HABEAS*
*CORPUS*
*ORS*
*34.360*

*I HAD NO ACCESS TO*
*OREGON LAW BOOKS*
*+ DIDN'T KNOW*
*WHAT THIS MEANT.*

Sincerely,

Charles M. Zennaché
Lane County Circuit Court Judge

/als
cc:    Liz Rambo, Trial Court Administrator
      Clerk of the Court
      Lane County District Attorney

*APP 26*

MAY 3, 2022

OREGON PUBLIC DEFENDER
1143 OAK
EUGENE, OR 97401

INRE: DNA PETITION - ORS 138.690

DEAR PD:

I'M FILING A DNA PETITION FOR POST
CONVICTION RELIEF. THIS LAW SAYS THE
COURT SHALL CONVENE A HEARING TO
ADDRESS THE FACTS I'VE PRESENTED IN
MY PETITION.

BECAUSE I'M IN PRISON, I CAN'T DEPOSE
PEOPLE OR GATHER AFFIDAVITS. THAT BEING
THE CASE, THE COURT WILL NEED TO APPOINT
LEGAL REPRESENTATION TO HELP ME. IN
THE EVENT THIS IS YOUR OFFICE, I'M
SENDING YOU A COPY OF WHAT I'M
FILING & WHAT I'VE POSTED ON
dianedowns.com

PERHAPS WE'LL WORK TOGETHER IN THIS.

SINCERELY,



(APP 27)

JUNE 2, 2022

NO RESPONSE

OREGON PUBLIC DEFENDER
1143 OAK ST.
EUGENE, OR 97401

IN RE: DOWNS V OREGON --- 22 CV 16308

SIRS + MADAMS:

My DNA PETITION WAS DOCKETED IN LANE
COUNTY ON 5-18-2022. I FIGURE MY
PETITION FOR RESENTENCING WILL BE ON
THE DOCKET THIS WEEK (NEXT WEEK AT
THE LATEST).

I REQUESTED THE ASSISTANCE OF AN ATTORNEY
TO CHASE DOWN EVIDENCE + WITNESSES.
I HAVE FEDERAL DOCUMENTS THAT
INDICATE THE OREGON CRIME LABORATORY
WAS STILL IN POSSESSION OF THE EVIDENCE
IN THE DOWNS CASE (1983) AS LATE AS
1998. I NEED TO KNOW TO WHOM I
SHOULD SEND THESE DOCUMENTS.

IN 1998, THE FEDS CREATED A DNA LAW.
IN 2010, OREGON CREATED A DNA LAW.

PAGE 1 OF 2                      APP 27

My ATTORNEY NEEDS TO KNOW THE EVIDENCE
IS THERE. LANE COUNTY CAN'T BE ALLOWED
TO EASILY DISMISS THIS CASE ON THE
FALSE CLAIM THEY DESTROYED THE
EVIDENCE.

PLEASE LET ME KNOW THE NAME OF THE
PERSON APPOINTED TO REPRESENT ME.

THANK YOU,

ELIZABETH DIANE DOWNS W49707
CCWF 512-02-k
P.O. Box 1508
CHOWCHILLA, CA 93610-1508

APP 27

PAGE 2 of 2

September 28, 2022

Innocence Project
PO Box 5248
Portland, OR   97208

In Re: DNA Testing / Lane County

Dear Mr. Wax:

On 5-6-2022, I requested DNA testing
and attorney representation in DOWNS v
OREGON, 22-CV-16308. It's been nearly
five months and the court refuses to
assign an attorney or test the DNA.

It seems obvious the state would want to
move this right along if the chewed
gum found next to a murder casing
was helpful to the state.

I need legal representation to prove the
DNA supports my request for a new
trial under ORS 138.696 (2). Please
represent me.

Sincerely,    Elizabeth Diane Downs, W49757
              CCWF 512-02-1L
              PO Box 1508
              CHOWCHILLA, CA 93610-1508

(App 28)

RECEIVED
10-2-2022    DATE: 10-11-22

STEVE,

DNA IS AT THE CORE OF WHAT YOUR
PROJECT DOES. LAST WEEK I ASKED YOU
TO LOOK INTO THE DNA PETITION I FILED
IN LANE COUNTY IN MAY 2022. IT WAS
ASSIGNED TO JUDGE CARLSON 8-8-2022.
NOTHING ELSE HAS HAPPENED IN FIVE MONTHS.

I GOT TO THINKING THEY MIGHT NOT
LET YOU SEE A COPY OF MY PETITION, SO
I'D BETTER SEND IT TO YOU. THIS IS MY
BACK UP COPY, SO PLEASE RETURN IT
TO ME IN THE ENCLOSED, STAMPED
ENVELOPE AFTER YOU COPY IT.

IT JUST SEEMS TO ME THE STATE
WOULD DEAL WITH THIS QUICKLY IF
THE DNA SUPPORTED THEIR CASE (OR
IF IT WAS INNOCUOUS).

THE ONLY REASON I CAN THINK
THEY REFUSE TO ACT ON THIS CASE IS
BECAUSE THE DNA IN THE CHEWED
GUM FOUND NEXT TO A MURDER CASING
PROVES I'VE BEEN TELLING THE TRUTH
ALL THESE 39 YEARS.

THAT'S EXACTLY WHAT YOUR
STAFF LOOK FOR. I HOPE YOU'LL ALL
WANT TO HELP ME.

Diane Downs

— OVER —↓

App 28

**Oregon
Innocence
Project**

Rec'd
11-3-2022

October 27, 2022

**Privileged / Work Product Protected**

*Via Mail*

Ms. Elizabeth Diane Downs
W49707
CCWF 512-02-2L
PO Box 1508
Chowchilla, CA 93610

Re:    Your Request for Assistance

Dear Ms. Downs:

The Oregon Innocence Project has completed our review of your case, including the files
maintained by the Office of the Federal Public Defender for the District of Oregon. I am
writing to inform you that the Oregon Innocence Project will not represent you as counsel
in your continued quest for exoneration. We would like to provide you some information
to help you further pursue your case on your own or with retained or appointed counsel.

Evidence Potentially Available for DNA Testing

Based on the record, there are at least two types of physical evidence that were recovered
near the crime scene in 1983 that may be susceptible to DNA testing, including: empty
beer cans and "freshly chewed" bubble gum. If this evidence still exists and is
susceptible to DNA testing, you may want to pursue testing of this evidence. While we
have no reason to believe the evidence is not still available and susceptible to DNA
testing, we have not confirmed either.

DNA testing of this physical evidence could provide information about other people who
were near to the scene of the crime prior to the event. However, even assuming that
another person's DNA is found on those items, that evidence alone may not conclusively
establish your innocence. If DNA of James Haynes is identified on the evidence, that
could be very helpful to your case (although it would not conclusively establish his
involvement). Likewise, if someone else's DNA is found and that person is in other ways
a viable suspect, that could also be helpful. That said, it is not a sure thing that the
evidence is still available, that it is susceptible to testing, or that any DNA tested will
prove helpful to your claim of innocence.

DNA Testing Motion

Enclosed with this memorandum are copies of the Oregon statutes relevant to what is
referred to as a "DNA Testing Motion." The relevant statutory sections are ORS



APP 29

P.O. Box 5248 Portland, Oregon 97208
www.oregoninnocence.org

**Oregon
Innocence
Project**

138.690, 138.692, 138.694, 138.696 and 138.697. The procedures for filing a post-conviction DNA Testing Motion were amended by statute in 2019 and are more liberal than the procedures that were in place prior to that time. Therefore, if you filed a DNA Testing Motion under the old statutes, you may be able to re-file such a motion under the new version.

You should carefully read the statutes if you would like to pursue this avenue because they must be followed precisely. In order to get a court order for testing to be performed, the court must find, among other things, that "[t]here is a reasonable probability that, had exculpatory results been available at the time of the underlying prosecution, there would have been a more favorable outcome to the underlying prosecution." ORS 138.692(7)(d).

You may be able to get an attorney assigned by the State to help you with a DNA Testing Motion. A person who is eligible to seek relief under the DNA Testing Motion statute (including someone who has been convicted of aggravated murder) is entitled to the appointment of counsel at state expense to assist the person in determining whether to file a DNA Testing Motion and during all stages of the DNA Testing proceedings described in ORS 138.692, 138.696 and 138.697. The requirements for getting counsel appointed by the court are found in ORS 138.694(2).

<u>James Haynes DNA</u>

We have reviewed the statements made by a number of witnesses regarding James Haynes' purported admissions of his involvement in the crime, and understand that you view him as the prime suspect. <u>DNA matching Mr. Haynes would be a significant step in establishing his involvement.</u> However, as you may know, <u>Mr. Haynes died in 2013.</u> In order to test any evidence for his DNA, you will need to procure either an item that contains his DNA or a sample of DNA of a close family member. <u>Mr. Haynes' son may</u> still live in the Portland area and, if he was willing, could <u>provide a DNA sample.</u> This is not something he could be compelled to do, but he might be receptive to cooperation.

Please let us know if you have any questions and feel free to have any counsel that is engaged to work on your case reach out to us about our review of the Federal Public Defender's Office case files. Best of luck to you in your continued pursuit of justice.

<u>Lane County DNA Petition</u>

In response to your letters dated 10-2-2022 and 09-28-2022, I reviewed the court record of the DNA petition you filed – case number 22CV16308. On October 4, 2022, Lane County Circuit Court Judge McAlpin entered a judgment dismissing the petition. Enclosed is a copy of the judgment and notice of judgment entered in the case. I have also enclosed your copy of the petition. ORS 138.697 is the statute authorizing an individual to appeal a judgment denying DNA testing. Please note, among other things, the time limits and notice requirements apply to appeals under ORS 138.697.



App 29

P.O. Box 5248 Portland, Oregon 97208
www.oregoninnocence.org

**Oregon
Innocence
Project**

Conclusion

Because OIP will not represent you as counsel in your continued pursuit for exoneration, we will be closing your case. We are very sorry that we are unable to assist you and wish you the best of luck in this tough situation.

Sincerely,


Kassidy Hetland
Staff Attorney


Encl:
ORS 138.690, 138.692, 138.694, 138.696 and 138.697
Petition for DNA Testing
Judgment Denying DNA Testing and Notice of Judgment  NoT ENCLOSED

My 10-2-2022 LETTER (ENCLOSED)

App 29

P.O. Box 5248 Portland, Oregon 97208
www.oregoninnocence.org

# O'CONNOR WEBER LLC
ATTORNEYS AT LAW

1500 SW First Ave
Suite 1090
Portland, OR 97201
Phone: 503-226-0923
http://oconnorweber.com

December 20, 2022

rec'd
12-27-2022

Elizabeth Diane Downs
ID# W49707
CCWF 512-02-01L
PO Box 1508
Chowchilla, CA 93610

Re:    Post Conviction Relief Appeal
       Lane County Case No. 22CV28855, 22CV16308

Ms. Downs:

My firm, O'Connor Weber LLC, has been notified that you want to appeal the judgment denying you post-conviction relief (PCR) in the above-referenced case. The Lane County Circuit Court appointed us to represent you on PCR appeal, and we have filed a Notice of Appeal with the Oregon Court of Appeals. A copy of the Notice of Appeal is enclosed.

I will briefly summarize the PCR appeal process. It is similar to the direct appeal process, which you may have gone through after your conviction and before your PCR trial. Someone will transcribe your trial and file the transcript with the Court of Appeals. The trial court will send the trial court file—the exhibits and other documents filed with the trial court—to the Court of Appeals. Once we have a complete copy of your trial court file and the transcript your case will be assigned to an experienced appellate attorney. You will be notified when your case is assigned to the appellate attorney who will brief your appeal.

It is important to understand the limitations of an appeal. We can only challenge the court's legal rulings. We cannot retry your case, we cannot argue that a witness lied, we cannot add evidence to the court record, and we cannot ask the Court of Appeals to reweigh the evidence. The only exception to that rule is the rare case where the trial court makes a finding of fact that is not supported by **any** evidence on the record. We also cannot argue that your post-conviction trial attorney was inadequate. We can only challenge rulings that were "preserved." That means that you or your PCR trial attorney must have raised a PCR claim in the petition and developed it during the PCR trial or made some objection during the proceedings to let the trial court know that it was making a legal error. With those limitations in mind, the attorney assigned to your case will review the post-conviction trial court record and raise meritorious legal issues in an Appellant's Opening Brief.



APP 30

1

The Oregon Department of Justice will file a Respondent's Answering Brief on behalf of the State. Then the Court of Appeals will review the briefs and decide your case. When the court decides your case, we will provide you with more information about your options for how to proceed.

Please keep in mind that if we do not win your appeal, the appellate courts may require you to pay the State of Oregon a prevailing party fee in the amount of $100 under ORS 20.190(1) and also to pay costs under ORS 20.310(2) and ORAP 13.05. Alternatively, please understand that if we win your appeal you could be retried or resentenced and it is possible that you could receive a longer sentence than was previously imposed.

Also, please remain in contact and notify us of any changes to your contact information. It is vital that we have your current contact information so we can keep you informed about your PCR appeal.

Finally, please write to us with any questions or concerns about the PCR appeals process or about your case. If you would like to schedule a call to discuss your case, please let us know in writing. If there is an urgent matter that cannot wait, you may also call us collect at the phone number listed on the letterhead. However, keep in mind that we may not always be available to accept collect calls. Thus, it is easier to communicate in writing.

Sometimes weeks or months may pass without you hearing from us. Do not be concerned. We will notify you of all significant events in your appeal, such as the filing of the transcript, the filing of motions and the filing of briefs. However, the Court of Appeals routinely grants transcribers extensions of time to file the transcript, and it routinely grants us and the State extensions of time to file the briefs. We will not notify you of those routine extensions of time. If you grow concerned at any point, please contact us.

We look forward to working with you on your PCR appeal.

Sincerely,

s/ Jedediah Peterson

Jedediah Peterson


App 30